William Kapelmast, J.
This is a motion made by the defendant pursuant to CPL 710.20 (subds. 1, 3) for an order: (1) suppressing the seizure of tangible property, to wit: two pairs of pants, three shirts, and one pair of boots, which were taken by the police from 1125 East 229 Drive, Bronx County, on January 23, 1973, and for an order (2) suppressing certain oral statements allegedly made by the defendant to detectives of the New York City Police Department on January 24, 1973 and statements allegedly made on January 26, 1973 to a probation officer of the City of New York. The court, pursuant to CPL *588 710.60 (subd. 6), now sets forth the following findings of fact, its conclusions of law, and the reasons for its determination.
At the hearing on this two-pronged motion the witnesses were Detective James Sloan, Sergeant John Hogan, Mrs. Mary Alston, Robert Bryant, Assistant District Attorney Louis Mazzone, Detective Ronald Marsenison, and Probation Officer Stephen Reinisch. In addition, two stipulations were entered on the record by the Assistant District Attorney and counsel for the defendant. This court will now summarize the testimony of the various witnesses at this hearing on the issues presented to this court.
Detective James Sloan testified that he was assigned to the investigation into the death of Mrs. Bea Wunsch on January 22, 1973 and that he went to the James Monroe High School in Bronx County that evening and again on January 23, 1973. Sloan further testified that he spoke to Robert Bryant, the defendant’s brother, on the 23d and learned where the defendant lived. This detective then testified that on January 23, at about 6:00 p.m. he and four other detectives went to 1125 East 229 Drive, Bronx County, and that he was accompanied to the apartment of the defendant by Detectives Marsenison and Sheridan. Sloan testified that a small child answered the door after which the three detectives were admitted into the apartment by Mrs. Mary Alston, the mother of the defendant. Sloan testified further .that the three policemen came into the living room and sat down. Sloan testified that in addition to the detectives, there were three other persons present: a child, the grandmother, and Mrs. Alston. Sloan testified further that during conversation with Mrs. Alston concerning her son’s movements and the clothing he wore the previous day, Mrs. Alston told him that the defendant, after coming home on Monday, had washed his clothes. Sloan testified that when he inquired as to where the defendant’s clothing was that had been washed, Mrs. Alston showed him where the clothing was. Sloan then testified that he observed the clothes piled on top of a broken dresser in a bedroom. He further testified that Mrs. Alston said: “Here are his clothes. If you want them you can have them. I have nothing to hide. ” When Detective Sloan was in the room he saw a pair of boots next to this dresser. Sloan testified that he asked her were those the boots that her son wore the previous day. Sloan testified that Mrs. Alston replied: “ If you want them you can have them. ’ ’ The detective also testified that Mrs. Alston handed him the clothes and that he, Sloan, picked up the boots from the floor. Sloan *589 testified further that he offered to give Mrs. Alston a receipt for the items hut that she declined it. Sloan further testified that at no time did he search the bedroom and, further, that he took the items to the 43d precinct and later the following morning he went to'the medical examiner’s office to have the items analyzed. Detective Sloan conceded that he did not have a search warrant when he came into possession of the boots and articles of clothing on January 23,1973.
Mrs. Mary Alston, the mother of the defendant, testified that the defendant lived with her all his life and that, on January 23, 1973 after 6:00 p.m., there was a knock on her door. She further testified that when she went to the ‘ ‘ peephole ’ ’ she saw one or two people. She testified that when she opened the door she asked the police to come in. She testified that five to seven police officers entered her apartment and asked her about her son Gary and the clothes he wore the previous day. Mrs. Alston testified that while she was talking in the living room with the police, some of them began to walk about her apartment and that some were searching in the bathroom and children’s closet. Mrs. Alston testified that, when the conversation centered on the defendant’s clothes, she told the police that the clothes her son washed were on a line in the bathroom. Mrs. Alston said that when the police went into the bathroom they exited with not only the defendant’s clothes but also a pair of her daughter’s blue jeans. Mrs. Alston testified further that the police gave her back that pair of jeans.
Mrs. Alston said that her son’s boots were in the closet in his room because that morning she had cleaned his room and had placed the boots in the closet. Mrs. Alston testified that she did not accompany any of the officers to the bathroom where the clothes were hung, or to the bedroom closet where the boots had been.
Mrs. Alston further testified that her son’s wallet and his personal papers therein were examined by the police. Mrs. Alston said that, while she did say that the police could examine thé clothes, she did not give them permission to take either her son’s clothes or the boots from her apartment and that her son’s clothes were not on top of the dresser in his bedroom. Mrs. Alston also testified that as the police left the apartment she was handed a paper containing a telephone number and was told to have her son telephone the police when he arrived home.
During cross-examination of this witness, the court received in evidence the testimony of this witness before the Grand Jury, *590 for the purpose of impeachment concerning (1) those present in the apartment at the time the police arrived on January 23; (2) telephone conversations by the witness with Judy or Valerie; (3) what the witness said to the police concerning the taking of the defendant’s clothing; and (4) the location of that clothing.
The court also received testimony by Assistant District Attorney Louis Mazzone concerning what Mrs. Alston said in his presence to Assistant District Attorney Dembin on September 20, 1974. Mr. Mazzone testified that on September 20, 1974 between 12 p.m. and 2 p.m. in the District Attorney’s office he heard Mrs. Alston state to Mr. Dembin that she gave the detectives the clothes and boots because she had nothing to hide. Further, that she “ gave them permission,” presumably to have them.
It was thereafter stipulated by and between counsel that Mrs. Alston was not interviewed by Assistant District Attorney Dembin on September 20, 1974 but on September 23, 1974 after 2:30 to 3:00 p.m.
Detective Ronald Marsenison was also called as a witness. He testified that on January 23,1973 he and four other detectives went to 1125 East 229 Drive, Bronx County, to Apartment 2D about 6:00 p.m. He further testified that Detectives Sloan, Sheridan, Graham and Alexander went with him to the building. Detective Marsenison testified that he, Sloan and Sheridan were admitted into the apartment after a small child answered the door and after the child called the mother, Mary Alston, to the door. Detective Marsenison further testified that Detectives Graham and Alexander did not enter the apartment until about one hour had elapsed and after the clothing and boots had been given to Detective Sloan.
Marsenison said that the three detectives went into the living room and that in the apartment there were an elderly woman and some children who were going in and out of the apartment. Marsenison testified that there was conversation between Detective Sloan and Mrs. Alston concerning the washing of clothes and that Mrs. Alston, when asked by Detective Sloan where her son’s clothes were, said “ Come with me and I’ll get them for you.” Marsenison testified that Mrs. Alston and Detective Sloan went to a rear bedroom. Marsenison testified that about two to three minutes later Detective Sloan came back into the living room with a bundle of clothes and a pair of black boots. Marsenison said that Mrs. Alston stated that Detective Sloan could have the clothes. This detective further *591 testified that when Detective Sloan asked Mrs. Alston about her son’s socks, Mrs. Alston left the room for a while, returned, and stated that she could not find the socks her son wore. This detective also testified that while in the apartment Detective Sheridan left with a sister of the defendant to look for him and returned to the apartment within 10 to 15 minutes. Marsenison testified further that when Mrs. Alston gave the clothes to Detective Sloan, Detectives Graham and Alexander were not in the apartment. This concluded all of the testimony concerning the seizure of the defendant’s boots and clothing.
On the issue of the voluntariness of statements allegedly made by the defendant, several witnesses testified for the prosecution and two for the defense.
Sergeant John Hogan testified that on January 24, 1973 he was ordered by Sergeant Farrell to go to a second-floor apartment at 1125 E. 229 Drive, Bronx County, and that he did so proceed to that apartment with another police officer in an unmarked police car. Hogan further testified that the defendant and his brother accompanied them from the apartment to the car and that the defendant, who was not handcuffed, and the brother, sat in the rear of the car. Sergeant Hogan also testified that he sat in the front passenger seat while his partner drove the automobile. Sergeant Hogan testified that he gave both the defendant and the brother the fourfold Miranda warnings and asked each of them if each understood each of the rights. Sergeant Hogan further testified that the defendant and the brother answered that they did understand the admonitions. Sergeant Hogan then testified that he spoke with the defendant concerning how blood got onto the defendant’s boots and that the defendant stated to him that he had cut himself on January 22, 1973 and further that the defendant showed him the finger that he had injured.
The Sergeant further testified that in the car on the way to the police station both the defendant and the brother spoke in the car and further that upon arrival at the precinct that the defendant was not restrained. Sergeant Hogan also testified that he told Sloan what the defendant had said in the car about the blood on the boots and the cut finger, when Detective Sloan reached the station house prior to the commencement of his interrogation of defendant.
Detective Sloan testified on this issue that on January 24,1973, he learned from his superior, Sergeant Thomas Farrell, that the defendant and his brother had been in contact with the police and wished to come in and speak with them. Detective *592 Sloan testified that he returned to the 43d precinct about 1:00 p.m. and was told by Sergeant Farrell that the defendant and the brother had gone out for coffee and cigarettes. The detective then testified that when he saw the defendant’s brother, Robert Bryant, Bryant told him that an attorney named Paul had told both of them to come to the police station and tell the truth. Sloan further testified that he spoke with the defendant from about 1:15 to 3:30 p.m., after first giving the defendant the Miranda warnings which he read from a card. Detective Sloan testified that he had asked the defendant if he understood the warnings and the defendant replied that he did so understand them. Detective Sloan then testified that the defendant, who was not handcuffed, stated that an attorney named Paul told the defendant that he should talk to the police and tell the truth.
Detective Sloan testified that the defendant made statements to him concerning the homicide investigation and that the questioning ceased when Mr. Saltzman, the defendant’s present attorney arrived, at the police station. Sloan testified that in Mr. Saltzman’s presence the defendant’s coat was given to him (Sloan) and that the defendant left the police station.
This detective testified that the defendant was not arrested until February 7, 1973. The court notes that, during the examination of this witness, there was a concession ;by defense counsel that no striking or beating of the defendant in any way, manner, shape or form was practiced on that date.
The next witness on the issue of the voluntariness of statements allegedly made by the defendant was the defendant’s brother Robert Bryant. Robert Bryant testified that on January 24, 1973, a Detective Hogan and another police officer came to his mother’s house after he had telephoned the police earlier that same day. Mr. Bryant also testified that he had spoken to a Detective Sheridan the previous day, January 22 and told this detective that he would bring his brother Gary in to the police the following morning. Bryant further testified that in the car driven by Hogan, there was no conversation between the police and him or his brother. The only thing said was between the two detectives — one saying the worst thing for a detective’s record was to have an unsolved homicide. Mr. Bryant also testified that when he arrived at the precinct, he and the defendant were told to go out and have breakfast because the detectives on the case were not there. Bryant testified that he and the defendant went out of the police station on two occasions before the detective arrived.
*593 On this branch of the combined hearing a stipulation was entered into that on January 24, 1973 Mr. Saltzman phoned the 43d precinct about 2:30 p.m. after an attorney named Paul had contacted him and after Robert Bryant had telephoned Mr. Saltzman. It was further stipulated that, when Mr. Saltzman telephoned the precinct, he spoke with a sergeant investigating ■the Monroe High School murder and Mr. Saltzman directed that the defendant not be questioned until Mr. Saltzman arrived there.
In this connection, this court notes that Detective Sloan testified that the defendant on January 24, 1973 stated to him that he had an attorney, a Mr. Paul, and that Mr. Paul had told •the defendant to come to the station house and tell the truth. Detective Sloan further testified that he did not contact Mr. Paul nor was he aware whether or not Mr. Paul had telephoned the detective offices where the defendant was.
The last witness called was Probation Officer Stephen Reinisch, who testified that he was assigned to supervise the defendant’s probation from December, 1971 or January, 1972 to January 26, 1973 and thereafter. Mr. Reinisch also testified that on January 26, 1973 he spoke with Detectives Marsenison and Graham and then learned that the police were investigating the defendant as a possible suspect in a homicide and wanted to examine the defendant’s medical records. He said that the detectives told him not to detain defendant for a technical violation of probation and did not ask him to speak with defendant concerning the murder. Mr. Reinisch further testified that later that day he saw the defendant when the latter came to get his methadone and that he spoke with the defendant at that time. Mr. Reinisch testified that he did not give the defendant any Miranda warnings. Mr. Reinisch also testified that on the same date, after speaking with defendant he went to the District Attorney’s office concerning the matter.
The defendant, in seeking to suppress the tangible property seized from his mother’s apartment, urges that there was a violation of his Fourth Amendment rights.
The People, on the other hand, contend (1) that the warrant-less seizure conducted in the apartment was validly made on consent; (2) that the consent given by the defendant’s mother is operable against the defendant.
The threshold question to be determined by this court is whether the defendant’s rights against illegal search and seizure can be waived by third parties. It is beyond cavil that such Fourth Amendment rights can be waived by third parties *594 (People v. D’Iorio, 16 N Y 2d 551, modfg. on other grounds 22 A D 2d 853, revd. on other grounds 17 N Y 2d 808; People v. Wood, 31 N Y 2d 975; People v. Kowalczyk, 20 N Y 2d 835; People v. Gallmon, 19 N Y 2d 389, 392, cert. den. 390 U. S. 911; United States ex rel. McKenna v. Myers, 232 F. Supp. 65, affd. 342 F. 2d 998, cert. den. 382 U. S. 857).
All warrantless searches are deemed unreasonable unless they fall within certain recognized exceptions, including a search upon voluntary consent (Bumper v. North Carolina, 391 U. S. 543; People v. Neulist, 43 A D 2d 150; Coolidge v. New Hampshire, 403 U. S. 443).
If the defendant’s mother voluntarily consented to the seizure of the defendant’s property, such a seizure is constitutionally permissible. While the general rule is that where a defendant challenges the admissibility of tangible evidence, he bears the ultimate burden of proof on that issue (People v. Malinsky, 15 N Y 2d 86; People v. Whitehurst, 25 N Y 2d 389), the rule is otherwise where the seizure is based upon a claimed voluntary consent (Bumper v. North Carolina, supra); then the burden rests heavily upon the prosecution to establish a voluntary waiver of a constitutional right ,(People v. Kuhn, 33 N Y 2d 203; People v. Whitehurst, supra).
The question of establishing a voluntary consent is one of fact (Schneckloth v. Bustamonte, 412 U. S. 218). And while a subject’s knowledge of a right to refuse is a factor to be considered, the People need not demonstrate such knowledge in establishing voluntary consent (Schneckloth v. Bustamonte, supra, pp. 248-249). .
Applying these principles to the case at bar, this court concludes that the People by clear and convincing evidence have met their heavy burden of estabishing that the seizure of the clothing and boots inside the defendant’s mother’s apartment on January 23, 1973 was based upon voluntary consent.
There is no question as to the propriety of the entrance by the three detectives into the mother’s apartment. They were invited in by her. Théir purpose was to speak with Gary Alston, an employee of the deceased, as part of an investigation involving the interview of many persons. Having been informed by Mrs. Alston that the defendant was expected shortly, they reasonably remained.
This court upon all the credible and believable evidence finds further that Mrs. Alston clearly and unequivocally, by words and actions, voluntarily informed Detective Sloan of the existence of particular items of clothing and then led the detective *595 to them on top of the broken dresser and told him he could take them. Similarly, this court finds by clear and convincing proof* that the boots were in open view at the base of the broken dresser and that Mrs. Alston gave this detective like permission to take the boots. Where the officer, as here, is directed to the evidence, there is hardly a better circumstance to show voluntary consent (Raimondi v. United States, 207 F. 2d 695; Robinson v. United States, 325 F. 2d 880).
Furthermore, the credible evidence adduced at the hearing demonstrates clearly and convincingly that the setting and circumstances were not inherently coercive (Channel v. United States, 285 F. 2d 217). No one in the premises was under arrest. Three detectives were sitting and/or standing in the living room while children came in and out of the apartment. Additionally, the sister of the defendant left the apartment with Detective Sheridan to look for the defendant and returned a short while later. The entrance to the apartment was at a reasonable hour — 6:00 p.m.— and the duration of the police’s presence was predicated upon Mrs. Alston’s statement that the defendant would be home shortly. This court notes the absence of threats or trickery and the total failure to demonstrate deceit or overreaching by the police.
On the question of coercive circumstances, this court notes the testimony of Mrs. Alston wherein she testified that she had been aware of the homicide at Monroe High School earlier on January 23, 1973, and her testimony concerning her expectation that the police would be investigating the matter.
This court must of necessity, in determining questions of fact, determine what the credible evidence is. On the question of voluntary consent, this court in determining issues of credibility has weighed with careful consideration the testimony of all of the witnesses and in particular has placed great reliance on those/portions of the Grand Jury testimony of Mrs. Alston offered in evidence to impeach her credibility on the issue of consent. This court, furthermore, notes the relationship of and interest in the defendant by this witness as contrasted with the further rebuttal testimony of Detective Marsenison and Assistant District Attorney Mazzone on this issue.
Accordingly, the defendant’s motion for an order suppressing the seizure of the clothing and boots seized from the defendant’s apartment is denied in all respects.
Turning to the second branch of the defendant’s motion, to suppress certain oral statements allegedly made by him to Detectives Hogan and Sloan on January 24, 1973 and to Mr. *596 Reinisch on January 26, 1973, the defendant argues: that the statements made on January 24, 1973, to the two detectives were involuntary because the required Miranda warnings (a) were not given and (b) if given, there was no voluntary waiver of those rights.
The People, on the other hand, contend that both statements are admissible, in that Miranda warnings were given and the defendant voluntarily waived them. Additionally, the People argue that the [defendant was not in custody at either -time statements were made by him on January 24, 1973.
This court finds upon all the credible evidence and beyond a reasonable doubt that the defendant was fully apprised of his fourfold Miranda rights by Sergeant Hogan en route to the police precinct from his home on January 24, 1973, and that he understood said warnings and knowingly waived them. The evidence adduced convinces this court that the defendant, when informed of the wishes of the police to question him, was waiting for the ¡police at his home and ¡accompanied them to the police station with his ¡brother after being aware of consultations with an attorney named Robert Paul. This court, however, is ¡mindful of the testimony of the defendant’s brother to the effect that there was ¡no conversation in the car by the defendant with anyone. The defendant may challenge the admissibility of any statement intended to he offered by the prosecution, notwithstanding denials that he made any statements (People v. Wright, 21 N Y 2d 1011). Similarly, this court finds beyond a reasonable doubt that the defendant was advised by Detective Sloan of his fourfold Miranda rights, that he understood said rights, and that he waived them voluntarily.
Moreover, this court finds that the statements alleged to have been made by the defendant were made on January 24, 1973 at a time when the defendant was not in ‘ ‘ custody ’ ’.
Miramda v. Arizona (384 U. S. 436, 439) dealt with “the admissibility of statements obtained from an individual who is subjected to custodial police interrogation”. Not every police interrogation requires the giving of the four-pronged warnings.
Miranda v. Arizona (supra) defined custodial interrogation to mean (p. 444) “questioning initiated by law enforcement officers after a person has been taken into custody or ¡otherwise deprived of his freedom of action in any significant way”.
As was said in the case of People v. Yukl (25 N Y 2d 585, 589) the issue is “ not what the defendant thought, but rather what a reasonable man, innocent of any crime, would have thought had he been in the defendant’s position ”. This court *597 finds that even if Detectives Hogan and ¡Sloan had not given the Miranda warnings such statements allegedly made by the defendant are voluntary and were given when defendant was not in a custodial status.
This court finds that the defendant knew of police efforts to speak with him. Furthermore, this court notes that the defendant waited for the police at his home and, significantly, left his mother’s apartment unrestrained and in the company of his older brother after his brother consulted .an attorney named Paul. Based upon the credible evidence and beyond a reasonable doubt, the defendant’s oral statements to both Hogan and Sloan were not the product of a police-dominated atmosphere where the defendant’s freedom of movement was deprived in any significant way (People v. Yukl, 25 N Y 2d 585, supra; People v. Rodney P., 21 N Y 2d 1).
The credible evidence demonstrates beyond any doubt whatsoever that at no time was the defendant in custody. To the contrary, at 'the police station itself, the defendant and his brother Robert Bryant left the precinct on two occasions, awaiting the arrival of the detectives. The fact that the defendant left the precinct twice (with his brother, who telephoned an attorney, confirms beyond any doubt the noncustodial status of the defendant’s position. The evidence clearly shows beyond a reasonable doubt that no arrest was made nor was custody implemented prior to February 7,1973.
"While not determinative on the issue of voluntariness in a custodial sense, this court has considered the concessions made by defense .counsel concerning written or recorded statements made to an Assistant District Attorney and before the Grand Jury under a waiver of immunity.
It is urged by the People that the stipulation concerning Mr. Saltzman’s phone call on January 24, 1973 to a sergeant iat the 43d precinct has no effect on the voluntariness of the statements allegedly made by the defendant. This issue is troublesome.
The evidence is clear that Mr. Saltzman did appear at the 43d precinct on January 24, 1973. At that point, all questioning ceased. There has ¡been no demonstration that the police — in particular, Detective Sloan — acted in a manner deliberately designed to ¡trick or deceive (People v. Robles, 27 N Y 2d 155, cert. den. 401 U. S. 945). The factual situation adduced before this court clearly distinguishes this case from People v. Arthur, 22 N Y 2d 325; People v. Donovan, 13 N Y 2d 148; People v. Gunner, 15 N Y 2d 226; People v. Failla, 14 N Y 2d 178. As was stated in Robles (supra, p. 159):In any case, therefore, *598 the rule of Arthur is not applicable unless there is evidence of conduct as there was in Vella which would indicate an intention to victimize a defendant or outwit his attorney in order to carry on an inquiry * * * The People are not to be charged with violating a defendant’s right to counsel when the opportunity to exercise that right has been fully and effectively extended to a defendant who chooses to speak rather than remain silent.”
This court is mindful of the language in People v. Gunner (supra) wherein the court said i(p. 232): “ As is manifest, our decision in Donovan sought to prohibit the police from questioning a suspect, in the absence of counsel, after an attorney has been retained to represent him and has apprised the police of his retention. It follows, therefore, that once a retained attorr ney contacts the police officer in charge and informs him, as in the present case, that he represents the suspect and does not want any statements taken from him, the police are precluded from thereafter questioning him or, if they do, from using against him any statements which he made in the absence of counsel
That which was condemned in Donovan, Failla, Gunner and Arthur is different from the factual setting at bar. Here the police were aware of the presence of an attorney named Paul from both the defendant and his brother. Furthermore, the police learned that Mr. Paul advised the defendant to tell the truth to the police. Here, the defendant through his brother made himself available for police interview, was not under arrest or in a custodial status. As the record reveals, the police interrogated the defendant from 1:30 or 1:45 p.m. until 3:45 p.m. Mr. Saltzman phoned the police about 2:30 p.m. and instructed the police not to question the defendant. If the court were to consider Mr. Saltzman’s call to the station house as curtailing the police right to interrogate thereafter, as a practical matter there is no evidence indicating the precise time of the call or a timetable schedule of Sloan’s interrogation as to what was said before or after the call. Therefore, this decision on this suppression motion treats the entire police interrogation on January 24, 1973 up until Mr. Saltzman’s arrival at the precinct, with no distinction made of that said prior to or after Mr. Saltzman’s call. No point of demarcation is possible.
The language in Gunner must be considered in light of People v. McKie (25 N Y 2d 19), wherein the Court of Appeals, in discussing “'spontaneous ” statements made by the defendant on the sheet, in a murder investigation, after his attorney advised the Nassau County police not to question McKie, said (pp. *599 23-24): “ The language of Arthur, the facts upon which it was decided and the cases relied upon in the opinion make quite clear : — even upon a cursory reading — that the rule laid down in that case is operative only when the police have taken an accused into custody (emphasis supplied) or deprived him of his freedom of action in any significant way (see Miranda v. Arizona, 384 U. S. 436).”
In discussing the Sixth Amendment right to counsel, the court focused on the crucial distinction >(p. 28) : “ In sum, the defendant’s Sixth Amendment right to counsel which protects the Fifth Amendment privilege against self incrimination was not violated because the defendant was neither in custody nor physically deprived of his freedom in any significant way.” Where, as here, the defendant was not under arrest or in custody nor physically deprived of his freedom in any significant way, the defendant’s Sixth Amendment right to counsel was not violated.
Finally, the defendant urges that statements made by him to Probation Officer Reinisch should be suppressed because they violate a confidential privilege; The People, however, contend that such statements were made by the defendant and are voluntary beyond a reasonable doubt.
This court finds that the statements allegedly made by the defendant were voluntarily made beyond a reasonable doubt. There is no requirement that Miranda warnings be given when a probation officer questions a probationer (People v. Ronald W, 24 N Y 2d 732; People v. Attonito, 29 N Y 2d 732). Moreover, there has been a clear showing that Officer Reinisch was not a police agent (People v. Mirenda, 23 N Y 2d 439; People v. Ruppert, 26 N Y 2d 437, app. after remand 35 A D 2d 1017, revd. 29 N Y 2d 519, cert. den. New York v. Ruppert, 404 U. S. 939).
People v. Ronald W. (24 N Y 2d 732, supra) tersely distinguishes interrogation by a probation officer from interrogation by a law enforcement officer (pp. 734-735). “ The questioning of the appellant was hardly the sort of incommunicado, police-dominated atmosphere of custodial interrogation and overbearing of the subject’s will at which the Miranda rule was aimed * * * It is true that a probation officer is a 1 peace officer ’ * * * but, certainly, he is not a ‘ law enforcement ’ officer within the spirit or meaning of Miranda v. Arizona (384 U. S. 436, supra).”
Section 65.10 (subd. 3, par, [c]) Of the Penal Law requires the probationer to answer all reasonable inquiries by the probation officer. The questions asked by Reinisch in light of the scant information available to him and in light of the officer’s *600 duty to insure that the probationer will lead a law-abiding life and to assist him to do so were reasonable (see CPL 410.50 [subd. .2]). This court finds that, at the very least, the probation officer’s information from the police concerning a homicide investigation, coupled with Beinisch’s knowledge of the probar tioner’s prior use of heroin, warranted him in determining if the probationer was complying, fully with the terms and conditions of probation.
Moreover, it is clear from the record that what Officer Beinisch did was not at the behest of the police but, in fact, contrary to their instruction. This would hardly constitute an agency (People v. Ruppert, 26 N Y 2d 437, supra). Finally, the statements made to Beinisch were not made while the defendant was in custody. The surroundings were familiar to the defendant; Officer Beinisch had been supervising him for about a yearthe interview occurred on a regularly scheduled visit by the defendant ; and the defendant left the probation office after the brief interview. Significantly,, in People v. Attonito (29 N Y 2d 732, supra), a probation officer questioned the defendant after he had been arraigned and assigned counsel for a violation of probation and after the defendant had been remanded to the county jail thereon. The Court of Appeals there sustained the validity of the statements taken by the probation officer.
In an analogous setting, it has been held that statements macle to the agents of the State Department of Labor concerning defendant’s wrongful receipt of employment benefits while working were voluntary and did not mandate the presence of counsel (People v. Accavallo, 57 Misc 2d 264).
Accordingly, the motion for an order suppressing certain.oral statements made on January 23 and 26 to the respective persons above is denied in all respects. This constitutes the decision of this court. The defendant has an exception.