[No. 7757–1–I.   Division One.   July 13, 1981.]

THE STATE OF WASHINGTON, *Respondent,* v. DAVID
DUHAIME, *Appellant.*

*Cody, Hatch & Bedle, George W. Cody,* and *Ross Miller,* for appellant.

844

*Russ Juckett, Prosecuting Attorney,* and *John Oswald, Deputy,* for respondent.

ANDERSEN, J.—

## FACTS OF CASE

The defendant, David Duhaime, appeals from the judgment and sentence entered upon his convictions of premeditated murder in the first degree, rape in the first degree, kidnaping in the first degree and robbery in the first degree.

Early in the morning of January 27, 1979, 17–year–old Victoria McAllister was brutally stabbed to death. Her body was found lying in the snow outside of the town of Gold Bar in Snohomish County. She had been abducted and raped prior to her death. Duhaime was arrested on February 1, 1979, in Crescent City, California and confessed to the stabbing.

At 1 a.m. on February 1, 1979, Undersheriff Bill Beard of the Del Norte County, California Sheriff's Office, received a phone call from Jeannie Berry, Duhaime's sister, stating that she had a problem and needed to see him. She and Mrs. Cornelius, Duhaime's mother, arrived at Beard's residence minutes later. Beard had known both women for over 18 years. They told Beard that they had received a phone call from David's father, Dale Duhaime, in Seattle and were afraid that David was "involved" in a murder. The women told Beard that the police had been to Dale's house looking for David and had connected the automobile that David was driving, a white Dodge Charger with a black top, to the murder. Further, David had borrowed $300 from his father and was on the run. Mrs. Cornelius told Beard she was certain that David would show up in Crescent City since she was David's mother and he usually came to see her or went to Crescent City when he was in trouble. She wanted him stopped by the police but not hurt. Ms. Berry and Mrs. Cornelius also told Sheriff Beard that the homicide involved two young black women, that one had gotten out of the car and one had not and that the victim was a

"hooker".

Beard advised the women to return home and go to bed. Three or 4 minutes after they had left, however, he received another call from Mrs. Cornelius telling him that David was in town, had just slowed down in front of her residence but then "peeled out". She again implored him to stop her son.

Beard immediately telephoned the sheriff's office and requested a roadblock be set up and ordered Duhaime's apprehension.

Officer James Maready of the Crescent City Police Department was on patrol at the time. He received radio communications advising him that Duhaime was wanted for murder in Washington, describing the car he was driving and giving a location for the vehicle. Upon entering that area, he observed a black–over–white Dodge Charger. As Duhaime later stated, the woman passenger in his car "was having labor pains so I pulled into the California Hiway Patrol Station and gave myself up." The officer asked the driver of the Charger if he was David Duhaime and the driver answered affirmatively. Officer Maready then advised him that he was under arrest on a murder charge from the State of Washington and Duhaime replied, "Yeah, I know."

At 2:50 a.m. on February 1, 1979, Detective Williams of the Del Norte County Sheriff's Office interviewed Duhaime in the detective's office. Williams first fully advised Duhaime of his constitutional rights. Duhaime responded that he understood his rights and wished to talk and signed a waiver form to this same effect.

Duhaime then gave Williams an account of the events in Washington and indicated that Bobby Joe Holmes had been with him at the time of the homicide. At 3:10 a.m. Duhaime was again advised of his rights and this time he gave a detailed taped confession to the murder of Victoria McAllister.

As the trial court was later to find, the defendant's confession was not the product of duress or coercion, but to the contrary, the defendant

was so anxious to make a statement that he initially interrupted Officer Williams during the time that his rights were given to him and was told that he had to be quiet so they could conclude reading his rights to him.

Ms. Anna Beilin, a social worker, was called to the sheriff's office at approximately 5 a.m. on the morning of February 1 to make a determination as to whether or not Duhaime was a danger to himself. She met with Duhaime in the attorneys' room at the sheriff's office at 5:10 a.m. and identified herself as a mental health worker. Although she explained to Duhaime that her report would not be confidential and that everything he told her could be used against him, she did not herself again advise him of his constitutional rights. Duhaime indicated to Ms. Beilin that he understood her admonition about confidentiality but talked freely.

On February 3, Duhaime made another full confession, after again waiving his rights, to Detective Ward of the Snohomish County Sheriff's Office.

Detailed findings of fact and conclusions of law were entered by the trial court in pretrial proceedings concerning confession (CrR 3.5(c)) and suppression (CrR 3.6) procedures.

Well into the trial, defense counsel informed the trial court that Duhaime would plead guilty to count 1, kidnaping in the first degree and the felony–murder part of count 3, if the judge would assure him that the maximum penalty on each count would be life imprisonment with the possibility of parole. The trial judge rejected the change of plea.

The jury commenced deliberation on the guilt phase of the trial the afternoon of June 11, 1979. Of the instructions given by the trial court to the jury, instruction No. 14 was on rape in the first degree (WPIC 4.22, 40.02, 11 Wash. Prac. 45, 224 (1977)) and instruction No. 37 was the accomplice instruction (WPIC 10.51, 11 Wash. Prac. 97 (1977)).

During its deliberation, the jury submitted questions to the court in writing asking "[c]an the 'accomplice' concept

of Instruction # 37 be inserted in place of the word 'defendant' in Instruction # 14(1)?" or "[i]s Instruction # 37 relating only to Instruction # 14(4)?" The trial judge answered the first question "Yes" and the second question "No".

According to the later affidavit of juror Michael Welch, when the jury began deliberating on the guilt phase of the trial, some concern was expressed among the jurors as to the order in which they should consider the charges. He said the jury foreman asked the bailiff and the bailiff replied, "step by step".

The jury returned its verdict on June 12, 1979, finding the defendant guilty of premeditated first degree murder, and guilty of the other three charges as well. The jury was then polled regarding the murder verdict. At that time juror Welch requested 5 more minutes in the jury room. The trial court directed the jury to retire for further deliberations and it did so.

Soon thereafter the same verdict was again presented by the jury and the jury was again polled. Juror Welch then declared that the verdict of premeditated first degree murder was his verdict. The jury was similarly polled on all of the verdicts and all jurors indicated that the verdicts were their own as well as those of the jury.

A special sentencing proceeding was then held pursuant to RCW 10.94.020. The trial court ruled that this proceeding should be bifurcated. The jury retired first to deliberate on the presence of aggravating and mitigating circumstances. This was during the morning of June 15, 1979.

The later affidavit of juror Anthony Gillardo recited that after the special sentencing proceeding had begun, he asked a second bailiff two general questions in reference to the juror's handbook. The first question he asked was "if a jury cannot arrive at a decision, are they then a hung jury?" The bailiff hesitantly replied, "Yes". This juror then asked, "does that mean that a jury would have to be dismissed and a new jury chosen to deliberate on the same matter?" The bailiff again responded only with the answer "Yes".

At 6:15 p.m. on June 15, the bailiff delivered a handwritten statement of juror Michael Welch to the trial court. Mr. Welch had written: "I rescind my vote on premeditated first degree murder. I request deliberation continue from the point where we discontinued Tuesday."

Later that evening, the court received two other questions, not related, from the jury foreman, George Shuh. The court thereupon met with the jury and informed them as follows:

Because you have entered on your deliberations, I can carry on no communications with you which might in any way influence your decision. Therefore, I must choose my words carefully and communicate only to and through your foreman.

The court then briefly answered one of the foreman's questions by reference to a written instruction.

At 3:20 p.m. the next day, the court received another note, this one signed by the foreman but evidently prepared by juror Michael Welch, again requesting rescission of the first degree murder verdict. The trial court responded by sending a written note to the foreman stating: "Would you please have the juror explain in writing the reason for this action on his part and will you then deliver such to the bailiff." The court received a 3–page, unsigned, handwritten letter from the juror in reply. In it he harked back to the jury's deliberations on the guilt phase of the trial, specifically as to the premeditation issue, and indicated dissatisfaction with the jury's discussion of the issue. The juror's letter concluded:

I do not want to leave the impression I was coerced into my original verdict decision. I will only say we did not have the amount of quiet time for personal reflection that we should have had.

I felt pressured by time, by the jury foreman, and by other jurors to make a decision which I now know was wrong.

Subsequent to my decision there was quiet time completely unpressured by others when I could have and should have changed my decision. It is a matter of my

personal weakness that I did not change my decision at that time.

No further communications took place between the court and the jury.

At 7 p.m. on June 16, 1979, the jury returned its verdict in regard to aggravating and mitigating circumstances. The jury found that the State had proved beyond a reasonable doubt that aggravating circumstances were present and that there were not sufficient mitigating circumstances to warrant leniency. All jurors responded affirmatively when polled. After further proceedings, the jury then determined that the evidence had not established premeditated first degree murder with clear certainty. Accordingly, the death penalty was not imposed but the defendant's sentence on the premeditated murder in the first degree conviction was life imprisonment without possibility of release or parole. RCW 9A.32.040(2).

The defendant's posttrial motions were denied. This appeal followed.

Six issues are presented.

## ISSUES

ISSUE ONE. Did the trial court err in failing to suppress the defendant's confessions to the murder and other crimes on the ground that they flowed from an arrest by California authorities which was illegal because there was no probable cause to make the arrest?

ISSUE TWO. Was it error to deny the defendant's motion to exclude the defendant's statements made to a social worker on the ground that he was not advised of his *Miranda* rights prior to giving the statements?

ISSUE THREE. Did the trial court err when, well into the trial, it refused the defendant's request to change his plea to guilty of kidnaping in the first degree and felony–murder in the first degree?

ISSUE FOUR. Is the death penalty law, RCW 10.94, constitutionally infirm?

ISSUE FIVE. Did the trial court err in giving the jury an

accomplice instruction and in then later instructing the jury as to its application in response to written questions submitted to the court by the jury?

ISSUE SIX. Was it error to deny the defendant's motion for a new trial based on irregularities in jury proceedings?

## DECISION

ISSUE ONE.

CONCLUSION. The trial court did not err in ruling that the California police had probable cause to arrest the defendant and in then refusing to suppress his confessions.

■ Probable cause for an arrest exists "'where the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in a belief that an offense has been . . . committed.'" *State v. Fricks,* 91 Wn.2d 391, 398, 588 P.2d 1328 (1979), quoting with approval from *State v. Gluck,* 83 Wn.2d 424, 426–27, 518 P.2d 703 (1974).

■ In *Aguilar v. Texas,* 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509 (1964), the Supreme Court propounded a 2-pronged test to determine whether an informant's tip could establish probable cause for a warrant. That test is equally applicable to determinations of probable cause to make an arrest without a warrant. *McCray v. Illinois,* 386 U.S. 300, 18 L. Ed. 2d 62, 87 S. Ct. 1056 (1967); *State v. Luellen,* 17 Wn. App. 91, 93, 562 P.2d 253 (1977). Under the first or "basis of knowledge" prong, facts must be revealed which permit the judicial officer to determine whether the informant had a basis for his allegation that a certain person had committed a crime. Under the second or "veracity" prong, facts must be presented to determine either the inherent credibility of the informant or the reliability of his information on that particular occasion. *McCray v. Illinois, supra; State v. Luellen, supra.*

At issue here is whether the information supplied to Undersheriff Beard by Ms. Berry and Mrs. Cornelius was sufficient upon which to conclude that there was probable

cause to make the arrest. As citizens well known to Undersheriff Beard, the "veracity" prong was satisfied. *See State v. Northness,* 20 Wn. App. 551, 556, 582 P.2d 546 (1978). With regard to the "basis of knowledge" prong, the tip must contain some underlying circumstances which would have allowed the informant to reasonably conclude that a crime had been committed by the defendant, and where, as here, the tip is based solely on hearsay, there must be a substantial basis for crediting the hearsay. *State v. Luellen, supra* at 94. A special relationship between the source of the hearsay and the accused can provide a substantial basis to credit the hearsay. *State v. Luellen, supra.*

The underlying circumstances on which the informants based their conclusion that David Duhaime was wanted for a murder in Washington were given to Undersheriff Beard. Although the tip was based solely on hearsay, the fact that the source of the hearsay was David Duhaime's father, Dale, was a substantial basis for crediting it. He had talked to David and loaned him $300 to leave the Seattle area. He had also talked to the Snohomish County authorities who were looking for David in connection with the murder. The officers had connected the car being driven by David to California with the crime. Dale concluded that David was involved in the murder and was on the run to Crescent City. The father–son relationship was a substantial basis to credit this hearsay.

The trial court did not err in holding that there was probable cause for the arrest of David Duhaime and that his confessions should not be suppressed.

ISSUE TWO.

CONCLUSION. Readvisement of the defendant's constitutional rights was not required under the circumstances here presented.

It is the defendant's claim that he should have been readvised of his *Miranda*[1] rights prior to being interviewed

---

[1]*Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966).

by Anna Beilin, a social worker employed by the Del Norte County Mental Health Clinic.

██ Following a CrR 3.5 hearing, the trial court found and concluded that the defendant had been "adequately and effectively warned of his constitutional rights" and that he

> was fully aware of constitutional safeguards to which he was entitled. The defendant elected knowingly and intelligently not to avail himself of the same and give a free, voluntary and intelligent statement to Mrs. Beilin.

Where a defendant has been adequately and effectively warned of his constitutional rights, it is unnecessary to give repeated recitations of such warnings prior to the taking of each separate in–custody statement. *State v. Vidal*, 82 Wn.2d 74, 78, 508 P.2d 158 (1973).

The defendant had signed a written waiver of his constitutional rights less than 2 hours before his meeting with the social worker. There is ample evidence to support the trial court's findings and conclusions in this regard. Readvisement of the defendant's rights was not required. *See State v. Rowe*, 77 Wn.2d 955, 959, 468 P.2d 1000 (1970); *State v. Blanchey*, 75 Wn.2d 926, 931, 454 P.2d 841 (1969), *cert. denied*, 396 U.S. 1045, 24 L. Ed. 2d 688, 90 S. Ct. 694 (1970).

ISSUE THREE.

CONCLUSION. Under the circumstances presented, the trial court did not abuse its discretion when it rejected the defendant's midtrial request to change his plea from not guilty to guilty to certain, but not all, charges in the information.

The statutory scheme covering the different aspects of the crime of murder in the first degree, as it existed at all times pertinent hereto, is somewhat complex.[2] Several interrelated statutes must be read together. The sections

---

[2]The Legislature of this State at its 1981 Regular Session enacted a comprehensive new act relating to capital punishment effective May 14, 1981. (Laws of 1981, ch. 138.)

relevant to the issue before us are as follows.

The first statute is the one defining the crime of murder in the first degree, RCW 9A.32.030(1). The subsections of that statute set out the different ways in which that crime can be committed, namely, by premeditated murder, by homicide under circumstances manifesting an extreme indifference to human life and by homicide while committing certain felonies. Count 3 of the information in the present case charged the defendant with having committed murder in the first degree by means of both premeditated murder and felony–murder.[3]

Next is the murder in the first degree sentencing statute, RCW 9A.32.040. It provides that anyone convicted of murder in the first degree shall be punished by death, mandatory life imprisonment or life imprisonment with possibility of parole according to findings made by a jury pursuant to a special sentencing procedure statute, RCW 10.94.020. One section of this latter statute, RCW 10.94.020(1), allows the jury to decide on the death penalty if: (a) the prosecuting attorney has timely served and filed a notice of intention to request the death penalty in accordance with yet another statute (RCW 10.94.010); and (b) only "in the event the defendant is found guilty of murder in the first degree under RCW 9A.32.030(1)(a)" (the premeditated murder section of the murder in the first degree statute).

In short, under the statutory scheme in effect at the times pertinent to this case, the defendant faced the death penalty only if convicted of premeditated murder in the first degree.

In *State v. Martin*, 94 Wn.2d 1, 9, 614 P.2d 164 (1980), the State Supreme Court decided that under this statutory scheme, the maximum penalty on a plea of guilty to premeditated first degree murder was life imprisonment with

---

[3]By the murder verdict form submitted to the jury in this case, the jury was instructed to first decide if the defendant was guilty of premeditated murder in the first degree and, if not, then to decide if he was guilty of felony–murder and, if not, to then decide if he was guilty of murder in the second degree.

possibility of parole. However, the situation in *Martin* was different from the situation in this case in two important respects.

First of all, in *Martin,* the court was only "concerned with a defendant's right to plead guilty to a charge of premeditated murder in the first degree", *State v. Martin, supra* at 2. Here the defendant did not try to plead guilty to premeditated murder in the first degree but offered to plead guilty to felony–murder in the first degree (*i.e.,* to murder committed during the course of a kidnaping) for which the law did not authorize the death penalty.

Secondly, in *Martin,* the defendant pleaded guilty to premeditated murder at the time of his arraignment and plea. Here the defendant was charged with premeditated murder in the first degree, and the statutory written notice of intention to request the death penalty (RCW 10.94.010) was filed contemporaneously with the information. It was on that charge, so supplemented, that the defendant was arraigned and entered his plea of not guilty. It was only when the case was some 2 weeks into the jury trial that the defendant for the first time sought to change his plea to guilty and then apparently only to guilty of kidnaping in the first degree and felony–murder in the first degree (as distinguished from premeditated murder in the first degree for which the death penalty could be imposed).

At the time of the enactment of RCW Title 9A, the new concept of aggravated murder in the first degree was described as "first degree murder plus". Washington State Crim. Just. Training Comm'n, *Revised Criminal Code Training and Seminar Manual* (ch. 9A.32, Homicide) (compiled and edited by G. Golob & G. Mooney 1976). What the defendant sought to do in this case by asking to change his plea to guilty of felony–murder in the first degree was, in effect, to change his not guilty plea to a plea of guilty to a lesser offense and so avoid punishment for the greater offense of premeditated murder. Nothing in the court rules or state statutes gives the defendant such a right. *See* CrR 4.2; RCW 10.01.060. Nor does the defendant

have a constitutional right to plead guilty. *State v. Martin, supra* at 4. Absent a controlling rule or statute, it is discretionary with the trial court to permit or deny the withdrawal of a plea of not guilty. 21 Am. Jur. 2d *Criminal Law* § 508 (1965); 22 C.J.S. *Criminal Law* § 421(7) (1961). *See State v. Anderson,* 165 Wash. 437, 438, 5 P.2d 994 (1931). The trial court did not abuse its discretion by denying the defendant's attempt to change his pleas.

ISSUE FOUR.

CONCLUSION. The State Supreme Court has ruled that the death penalty law, RCW 10.94, is constitutionally infirm in part; but it is not infirm in those aspects of it applicable to this appeal.

All of the defendant's contentions claiming unconstitutionality of RCW 10.94 have now been answered by the State Supreme Court in *State v. Frampton,* 95 Wn.2d 469, 627 P.2d 922 (1981).[4] That case holds: the statutory procedures for imposing the death penalty are unconstitutional;[5] life imprisonment without the possibility of parole is constitutional; the death penalty established by RCW 9A.32 and RCW 10.94, including the requirement of RCW 10.94-.020(10)(b) that the jury predict the defendant's future dangerousness, is valid; and that death by hanging is constitutional.

Since the jury in the case before us did not mandate the death penalty, the aspects of the death penalty held unconstitutional in *Frampton* are not pertinent to this appeal. Furthermore, RCW 10.94 contains a valid severability clause which provides that the invalidity of any por-

---

[4]Following his appeal to this court, the defendant moved to transfer the appeal to the State Supreme Court. The motion was denied by the Supreme Court. Subsequently, we entered an order staying the appeal pending the Supreme Court's resolution of aspects of premeditated murder in the first degree law in *Frampton.*

[5]This result was compelled by the holding in *State v. Martin,* 94 Wn.2d 1, 614 P.2d 164 (1980) that a defendant charged with first degree premeditated murder could avoid the death penalty by pleading guilty at arraignment. The statutory procedures have now been amended to change this. (Laws of 1981, ch. 138.)

tion of the act will not affect the remainder of the act. RCW 10.94.900.

Basically, the defendant's argument is that since he could have pleaded guilty to premeditated murder in the first degree (but did not) and been sentenced to life imprisonment with possibility of parole (as determined in *State v. Martin, supra*), his equal protection rights were violated when he was sentenced to a mandatory life term because he chose to go to trial. *United States v. Jackson,* 390 U.S. 570, 20 L. Ed. 2d 138, 88 S. Ct. 1209 (1968). That contention is answered contrary to the defendant's position in *State v. Frampton, supra.* A majority of the court there held: that life imprisonment without the possibility of release or parole is not a substantially different penalty from life imprisonment with the possibility of parole; and that imposition of a sentence of life imprisonment without the possibility of release or parole under RCW 9A.32 and RCW 10.94 for defendants who plead guilty to or are convicted of aggravated murder in the first degree is constitutionally valid.

Issue Five.

Conclusion. Neither the accomplice instruction nor the trial court's response to written interrogatories from the jury with respect thereto were erroneous.

The defendant in his opening brief cites no authority for his contention that the court erred in this regard and in his reply brief he refers only to the general principle, with which we agree, that instructions should not be misleading. The accomplice instructions were neither misleading nor improper.

Here the accomplice instruction was that recommended in WPIC 10.51, 11 Wash. Prac. 97 (1977). "The law is settled in this jurisdiction that a verdict may be sustained upon evidence that the defendant participated in the commission of the crime charged, as an aider or abettor, even though he was not expressly accused of aiding and abetting and even though he was the only person charged in the information." *State v. Carothers,* 84 Wn.2d 256, 260,

525 P.2d 731 (1974). *Accord, State v. Young,* 89 Wn.2d 613, 630, 574 P.2d 1171, *cert. denied,* 439 U.S. 870, 58 L. Ed. 2d 182, 99 S. Ct. 200 (1978).

"When the court received the interrogatory, it had a right to instruct the jury in any manner that it saw fit, and, if the instruction given was correct, as a matter of law, there is no just ground for complaint." *State v. Frandsen,* 176 Wash. 558, 563, 30 P.2d 371 (1934). The trial court's answers to the interrogatories from the jury were legally correct and served to clarify whatever confusion the jury may have had on the subject.

ISSUE SIX.

CONCLUSION. In view of the nature of the irregularities in the jury proceedings, the trial court did not abuse its discretion by denying the defendant's motion for a new trial based thereon.

The defendant argues that he was entitled to a new trial because: (1) during the polling of the jury at the end of the guilt phase of the trial, juror Welch asked for and was given time for additional jury deliberations; (2) during the penalty phase of the jury deliberations, juror Welch said he wanted to "rescind" his vote as to the premeditation verdict returned by the jury in the earlier guilt phase of the trial; and (3) because of the bailiffs' statements made to jurors.

After hearing the defendant's arguments in this regard, the trial court denied the defendant's motion for a new trial. An appellate court will not reverse an order granting or denying a new trial motion except where the trial court has abused its discretion. *State v. Crowell,* 92 Wn.2d 143, 145, 594 P.2d 905 (1979).

When, during the polling of the jury, a juror asked for additional time to deliberate, the trial court was fully authorized to allow additional time for that purpose as it did.

When a verdict or special finding is returned and before it is recorded, the jury shall be polled at the request of any party or upon the court's own motion. *If at the conclusion of the poll, all of the jurors do not*

*concur, the jury may be directed to retire for further deliberations* or may be discharged by the court.
(Italics ours.) CrR 6.16(a)(3).

Once the verdict has been received and filed for record and the guilt phase of the trial concluded, it was not within the province of the jury to change or modify its verdict, even though the jury had not been discharged but had proceeded to the penalty phase of the murder trial. *See Beglinger v. Shield,* 164 Wash. 147, 152–54, 2 P.2d 681 (1931); 76 Am. Jur. 2d *Trial* § 1214, at 171 (1975).

The reasons given by juror Welch, who during the penalty phase of the case asked to rescind his vote on premeditation during the preceding guilt phase, did not concern jury misconduct. It concerned only his own thought processes relating to premeditation. As such, his views inhered in the verdict on the guilt phase of the case and could not later be used to impeach it. *Gardner v. Malone,* 60 Wn.2d 836, 841, 376 P.2d 651 (1962); *State v. Forsyth,* 13 Wn. App. 133, 136–40, 533 P.2d 847 (1975).

As to the remarks of the two bailiffs, the trial court properly proceeded to ascertain what it was they had said and then to examine those remarks for their possible prejudicial impact. *State v. Crowell, supra* at 147. As to this, the trial court ruled:

> The statement attributed to the bailiff that [the jury] should proceed step by step to their deliberations was by no stretch of anyone's imagination capable of being interpreted as a prejudicial remark.

And further:

> The other matter referred to involving the other bailiff and the other juror could be somewhat of a closer question, although I think taken in context it, too, is not prejudicial. Rule 6.2 of the Criminal Rules provides that jurors shall be given a jury handbook. A provision of that handbook or a comment in that jurors handbook states that if the jury cannot agree within a reasonable time, it generally means a new trial, which is a greater expense to the parties and the State, so the jurors are expected to try to reach a verdict which is a true verdict.

I just cannot come to any conclusion other than that these procedures did not prejudice the defendant's right to a fair trial before this jury, and that such do not measure up to juror misconduct or irregularity in jury proceedings.

The motion for new trial on that basis will be denied.

We agree. Although the bailiffs' remarks were unfortunate and inexcusable, they could not have coerced the jury's verdict or prejudiced the defendant in any way.

Affirmed.

JAMES, C.J., and DURHAM, J., concur.

Reconsideration denied January 13, 1982.

Review by Supreme Court pending March 1, 1982.