[No. 1200-3.    Division Three.    January 6, 1976.]

THE STATE OF WASHINGTON, *Respondent*, v. ANTHONY ROBERTS, *Appellant*.

*Collins & Hansen* and *Nels A. Hansen,* for appellant (appointed counsel for appeal).

*Paul Klasen, Prosecuting Attorney,* and *John Hilzer, Deputy,* for respondent.

McINTURFF, C.J.—Anthony Roberts appeals from his conviction of grand larceny[1] and taking and riding in a motor vehicle without the permission of the owner.[2] The primary contentions of Mr. Roberts, who was a parolee, concern: (1) whether a parole officer, upon a phone call initiated by a parolee, must give *Miranda* warnings prior to listening to statements which are inculpatory; (2) whether statements made by a parolee to a parole officer are confidential and rise to the status of privileged communications; and (3)

---

[1] RCW 9.54.010.
[2] RCW 9.54.020.

whether a continuance should be granted to ascertain if the defendant is the subject of a "47 XYY syndrome."

Mr. Roberts was an accessory to the theft of an automobile, camping equipment, and two guns in Moses Lake, Washington. After being persuaded by his girl friend, he later telephoned his parole officer in Pasco, Washington, from the girl friend's residence in Seattle. According to the parole officer:

> He indicated that he had done the most stupid thing a man could do on parole. I asked him what he had done and he said that he and a friend had burglarized a camper, taking a .22 rifle and a .22 pistol, and that they had subsequently left the camper and had stolen an automobile. Tony went to great pains to explain that his friend, by the name of Wayne, had stolen the automobile, but that he had ridden in it to Seattle, and therefore was an accessory, because he knew the automobile was stolen. . . . Tony was calling, he said, realizing his parole would be revoked, and that prior to any revocation he simply wanted to set the record straight on what he had or had not done.

This, and other testimony by the parole officer, was admitted at trial after Mr. Roberts' unsuccessful motion to suppress. Mr. Roberts' motion for a continuance to allow additional psychiatric examination was also denied.

### MIRANDA RIGHTS AS BETWEEN NONCUSTODIAL PAROLEE AND HIS PAROLE OFFICER

Mr. Roberts contends that the court erred in admitting testimony by his parole officer concerning statements made by Roberts during their telephone conversation. Mr. Roberts argues that the failure of his parole officer to give *Miranda* warnings prior to the statements made suppression mandatory.[3]

Statements by an accused during custodial interrogation are inadmissable at trial for use by the prosecution in the absence of certain procedural safeguards effective to secure the privilege against self-incrimination. Custodial in-

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966).

terrogation, within the meaning of this rule limiting admissibility, means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."[4]

There is general agreement among other jurisdictions that statements by a parolee to his parole officer while in custody are inadmissible at trial (not a revocation hearing) in the absence of *Miranda* warnings.[5] Statements by a parolee to his parole officer while in custody have been found admissible where the facts show statements were voluntary after *Miranda* warnings.[6]

In those instances where the parolee was *not* in custody, statements to his parole officer without prior *Miranda* warnings have been held admissible. In *People v. Alston,* 79 Misc. 2d 586, 360 N.Y.S.2d 768 (1974), statements made to a probation officer were admissible even though *Miranda* warnings were not given, where the defendant was not in custody, evidence indicated the statements were voluntary and there was no showing the probation officer was a police agent. Where a probation officer went to the probationer's home to question him about criminal activity, and the probationer was not in custody but was questioned in his own front yard, the probation officer was allowed to testify concerning statements made.[7]

---

[4]*Miranda v. Arizona,* 384 U.S. 436, 444, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966).

[5]*United States v. Deaton,* 468 F.2d 541, 544 (5th Cir. 1972); *People v. Gastelum,* 237 Cal. App. 2d 205, 46 Cal. Rptr. 743, 746 (1965); *State v. Lekas,* 201 Kan. 579, 442 P.2d 11, 15 (1968); *State v. Gallagher,* 38 Ohio St. 2d 291, 313 N.E.2d 396, 400 (1974), United States appeal pending, U.S. No. 74-492, 43 L. Ed. 2d 761, 95 S. Ct. 1445 (1975); *see Mathis v. United States,* 391 U.S. 1, 4, 20 L. Ed. 2d 381, 88 S. Ct. 1503 (1968); *People v. Arnold,* 66 Cal. 2d 438, 426 P.2d 515, 521-22, 58 Cal. Rptr. 115 (1967).

[6]*Gilmore v. People,* 171 Colo. 358, 467 P.2d 828, 830 (1970); *People v. Hingerton,* 74 Misc. 2d 1063, 346 N.Y.S.2d 915, 919 (1973); *State v. Gallagher,* 36 Ohio App. 2d 29, 301 N.E.2d 888, 891 (1973), *rev'd,* 38 Ohio St. 2d 291, 313 N.E.2d 396 (1974), United States appeal pending, U.S. No. 74-492, 43 L. Ed. 2d 761, 95 S. Ct. 1445 (1975).

[7]*State v. Johnson,* 202 N.W.2d 132 (S.D. 1972).

A prominent case in this area is *People v. W*, 24 N.Y.2d 732, 302 N.Y.S.2d 260, 249 N.E.2d 882 (1969), where the court was asked to decide whether a probationer must receive the fourfold warnings announced in *Miranda* prior to being questioned by a probation officer. In this case a young man told his probation officer that his companion desired help with narcotics. The probation officer noticed marks on the probationer's arm, asked him to come in, and questioned him about the needle marks. The probationer hesitated to answer but eventually admitted that he and his friend had purchased and taken heroin 2 days earlier. The court said, at 734-35:

> The questioning of the appellant was hardly the sort of incommunicado, police-dominated atmosphere of custodial interrogation and overbearing of the subject's will at which the *Miranda* rule was aimed. The clearly stated objectives of education and rehabilitation which are always paramount in the relationship between the probation officer and the probationer [Citations omitted.] are totally foreign to the elements the Supreme Court addressed itself to in *Miranda*.
>
> Here, the appellant had not been arrested and charged with a crime, but rather had freely come to the department seeking help for a friend. When questioned about the marks on his arm, he was not alone and incommunicado, but rather was in the company of his own probation officer and Lawrence Miller (the friend whom he had brought to the department for help). He was questioned not by policemen charged with the duty of apprehending and convicting criminals, but rather by probation officers whose aim is to help probationers rehabilitate themselves.

In the present case Mr. Roberts was not in custody at the time of his statements to his parole officer, but was staying at a residence in Seattle. He was not incommunicado, but with a girl friend when he made the call. He was mobile and presently in a location unknown to his parole officer or police. It was only known that defendant was somewhere in Western Washington, having given his phone number together with the area code when requested by his parole

officer. These facts demonstrate that the defendant was not subjected to a custodial interrogation within the meaning of *Miranda* when his statements were made.

■ Volunteered statements of any kind are not barred by the Fifth Amendment, and their admissibility is not affected by the rule of *Miranda*.[8] Where the parolee voluntarily contacts his parole officer, the parole officer may testify at trial as to statements made.[9] Mr. Roberts in the present case voluntarily contacted his parole officer by phone, seeking upon his own initiative to "set the record straight."

We conclude that the defendant's statements to his parole officer were not made while in custody, and were volunteered. They therefore fell outside the Fifth Amendment privilege against self-incrimination and the rule of *Miranda*; and were properly admitted at trial. Accordingly, we hold that testimony by a parole officer concerning voluntary statements made by a parolee during a noncustodial interrogation is admissible at trial, though prior to questioning, the parolee was not advised of his right to remain silent, his right to counsel prior to questioning, and that any statement could be used as evidence against him.

### Privileged Communications Between Parole Officer And Parolee

Mr. Roberts next contends that the relationship between parole officer and parolee is a confidential one, that all communications between the two are thereby privileged, and that to hold otherwise would undermine the rehabilitation process invisioned by the parole system. We agree that rehabilitation of convicted persons through parole is in the best public interest; that a confidential relationship between a parolee and his parole officer is beneficial; that a good relationship does depend upon mutual trust and confidence; but we disagree that these communications are priv-

---

[8]*Miranda v. Arizona*, 384 U.S. 436, 478, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966).

[9]*People v. W, supra*.

ileged, such as those between attorney-client, husband-wife, physician-patient, or priest-penitent.

■ A parole officer's primary responsibility is to the court, secondly to the individual being supervised. The bounds within which the convicted person may act are generally set by the court, with implementation of the rules initiated by the supervising officer. The pragmatic enforcement of these rules is the duty of the supervising officer. A material violation by the parolee necessitates notice to the court. To hold that each communication between the parolee and his parole officer is privileged would close the lips of supervising personnel and allow the parolee to confess serious crimes with impunity.

Mr. Wigmore has stated four fundamental conditions precedent to the establishment of a privilege against the disclosure of communications.[10] The fourth condition is:

> The *injury* that would inure to the relation by the disclosure of the communications must be *greater than the benefit* thereby gained for the correct disposal of litigation.

In *State v. Johnson*, 9 Wn. App. 766, 773, 514 P.2d 1073 (1973), we declined to recognize any parolee-parole officer privilege, stating that the creation of this privilege should be left to the legislature.

Considering the fourth fundamental condition precedent to the establishment of a privilege as set out by Mr. Wigmore, it is our opinion that the injury to the relationship between Mr. Roberts and his parole officer by the disclosure of communications between them is outweighed by the greater benefit to society as a whole to the end that justice will be better served. Perhaps the following is appropos:

> Liability, Dewey tells us, is the beginning of responsibility. The individual is held accountable for what he has done in order that he may be responsive in what he is going to do. Only thus do people gradually "learn by dramatic imitation to hold themselves accountable, and liability becomes a voluntary deliberate acknowledge-

---

[10]8 J. Wigmore, *Evidence* § 2285, at 527 (McNaughton rev. 1961).

ment that deeds are our own, that their consequences come from us."[11]

This answers the contention of Mr. Roberts that RCW 5.60.060(5)[12] should be extended to allow a parolee-parole officer privilege.

## 47 XYY SYNDROME

Defendant further assigns error to the refusal by the trial court to grant his motion for a continuance to allow additional psychiatric examination. It is the argument of defendant's counsel that defendant has characteristics of the "47 XYY syndrome," affecting mental competence. By denying the continuance, it is contended the trial court denied defendant this defense.

The "47 XYY syndrome" is a relatively recent defense theory which alleges mental incompetence due to a chromosome abnormality. The normal woman has a chromosome constellation containing two sex-determining chromosomes (XX), while the normal man has one X and one Y chromosome (XY). In some men, perhaps one in one thousand, a chromosome abnormality exists in which there is an XYY or "super male" constellation theorized to result in greater aggressive and anti-social behavior. There does in fact seem to be an incidence of the XYY defect among institutionalized men. However, the behavioral impact of this chromosome defect has not been precisely determined.

The XYY individual is said to often be extremely tall, with long limbs, facial acne, an aggressive behavior often directed toward property rather than persons, with no significant family history of mental illness or criminal activity. The XYY criminal also tends to be more resistant to conventional corrective training. "But . . . presently available medical evidence is unable to establish a reason-

---

[11]J. Dewey, *Morals and Conduct*, in *Man and Man: The Social Philosophers* 484-85 (J. Cummins & R. Linscott ed. 1954).

[12]RCW 5.60.060(5):

"A public officer shall not be examined as a witness as to communications made to him in official confidence, when the public interest would suffer by the disclosure."

ably certain causal connection between the XYY defect and criminal conduct."[13]

The granting or denying of a continuance lies within the sound discretion of the trial court, and will not be disturbed on appeal, except for manifest abuse of discretion.[14] In the absence of sound medical support of the XYY defense, the trial court did not abuse its discretion in denying defendant's motion for a continuance.

Judgment of the Superior Court is affirmed.

GREEN and MUNSON, JJ., concur.

Petition for rehearing denied February 19, 1976.

---

[13]LaFave & Scott, *Criminal Law* 334 (1972); *see also People v. Tanner*, 13 Cal. App. 3d 596, 91 Cal. Rptr. 656, 659 (1970) and *People v. Yukl*, ........ App. Div. 2d ........, 372 N.Y.S.2d 313 (1975); Annot., 42 A.L.R.3d 1414; 62 *Journal of Criminal Law* 59, 72-73 (1971); 9 Harv. J. Legis. 469, at 481 (March 1972); 6 N.C. Cent. L.J. 66, 80 (Fall 1974); 48 S. Cal. L. Rev. 489, 502-03 (Nov. 1974).

[14]*State v. Williams*, 84 Wn.2d 853, 855, 529 P.2d 1088 (1975); *Burns v. Norwesco Marine, Inc.*, 13 Wn. App. 414, 417, 535 P.2d 860 (1975).