[No. 10947-2-I. Division One. March 26, 1984.]

THE STATE OF WASHINGTON, *Respondent,* v. THOMAS ROY HUBBARD, *Appellant.*

138

*Julie Kesler* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Margaret D. Fitzpatrick, Special Deputy,* for respondent.

SCHOLFIELD, J.—Defendant Thomas Roy Hubbard appeals his conviction for first degree murder, RCW 9A.32-.030, while armed with a deadly weapon, RCW 9.95.040, which constituted a firearm, RCW 9.41.025. We affirm.

The victim, Peter Edwards, Jr., was shot to death at the corner of 26th Avenue and Cherry Street in Seattle on June 1, 1981. Edwards' companion at the time of the shooting,

Regina Bousley, identified Hubbard as the killer.

Hubbard was arrested on June 2, 1981, at approximately 5:30 p.m. He was advised at that time of his constitutional rights, including the right to remain silent, as required prior to any custodial interrogation by *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966). At the Public Safety Building, he read his constitutional rights audibly from a "rights form" which he then signed, acknowledging advice of those rights. He told the officer he understood his rights. He did not request a lawyer, but did ask to see his parole officer. These events occurred at approximately 6 p.m. on June 2, 1981. A police officer immediately tried to contact Hubbard's parole officer by telephone.

Hubbard's parole officer met with him in an attorney interview room at the King County Jail at 10 a.m. the next day. She did not advise him of his constitutional rights before commencing the interview. Hubbard had been under her parole supervision for approximately 2 years. She asked him why he was in jail, and Hubbard proceeded to tell her there had been a shooting, that a witness claimed Hubbard did it, and he had been charged with the killing. He told her he was in the area and was a witness to the shooting but had nothing to do with it. The parole officer then asked questions in an effort to find out where Hubbard was in relation to the victim at the scene of the shooting. She later asked him, "Well, what did you see?" At that point, Hubbard asked her if they could speak confidentially, and she told him she could not keep his comments confidential. The conversation terminated shortly thereafter.

At the CrR 3.5 hearing, the parole officer was asked her purpose in interviewing a parolee under her supervision who had been arrested. She testified:

> The purpose of me interviewing a person who has been arrested is to get their version of what the incident was, not necessarily to get an admission or denial. Just their explanation of how they came to be in that situation.

The two police officers who arrested Hubbard also testified.

Hubbard was advised of his right to testify or not as prescribed by CrR 3.5. Hubbard elected to not testify and no evidence was offered in his behalf.

The judge conducting the CrR 3.5 hearing ruled the parole officer's testimony inadmissible on the ground that Hubbard's statements were obtained without additional *Miranda* warnings by the parole officer. The judge ruled, however, that the statements "clearly could come in at least as part of the case of the State in rebuttal." Hubbard made no claim the statements were coerced or the result of probing interrogation.

Hubbard made additional pretrial motions to (1) exclude evidence, for impeachment purposes, of his 1975 conviction for possession of heroin and (2) exclude testimony of two witnesses whose names were not provided to the defense by the date specified in the discovery order. The trial judge denied these motions in limine.

Hubbard also made a pretrial motion to exclude evidence relating to Hubbard's alleged burglary of Edwards' home. The trial judge denied the motion, stating that he would reserve ruling until the evidence was offered at trial. The parties agreed upon, and the trial judge approved, an oral stipulation granting Hubbard a continuing objection to these rulings after defense counsel expressed concern over the appealability of an "adverse ruling on a Motion in Limine."

At trial, the State presented evidence that because Edwards and his family suspected Hubbard of burglarizing their home in December 1980, Edwards had his stepson severely beat Hubbard in the following month. This evidence was offered to show Hubbard's motive for shooting Edwards and Hubbard's familiarity with Edwards.

Hubbard presented an alibi defense. He did not testify in the defense case in chief, but his girl friend testified that Hubbard was at home with her at the time of the shooting. The State called the parole officer to rebut the girl friend's testimony. The parole officer testified over objection about the conversation in which Hubbard told her he had been in

the immediate vicinity of the shooting. Hubbard then testified to rebut the parole officer's testimony and denied making any such statement.

Hubbard first contends the trial judge erred in admitting his statements to the parole officer to rebut alibi testimony of a defense witness. He asserted below that the statements were obtained in violation of *Miranda v. Arizona, supra.* We do not agree with the trial judge's initial ruling that his statements were within the exclusionary rule set forth in *Miranda v. Arizona.*

*Miranda v. Arizona* was one of four cases decided in the *Miranda* opinion. In all four cases, confessions were obtained from the defendants as a result of custodial interrogation without advice to the defendants prior to interrogation of certain basic constitutional rights which are now commonly referred to as "*Miranda* rights." Throughout his majority opinion, Chief Justice Warren stated that the Court's holding was directed against the use by the State of statements obtained from a defendant as a result of custodial interrogation.

> Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *By custodial interrogation, we mean questioning initiated by law enforcement officers* after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

(Italics ours.) *Miranda v. Arizona, supra* at 444.

At page 478 of the opinion, the Court distinguished statements which are not the result of custodial interrogation.

> In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissi-

ble in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. *Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.*

(Footnote omitted. Italics ours.)

██ Hubbard's statements to his parole officer were not the result of interrogation by law enforcement officers nor were they made without prior advice of his right to remain silent. Hubbard requested an opportunity to talk to his parole officer, initiated the conversation, and the record carries not the slightest suggestion of coercion or that his statements were not freely and voluntarily made. *Miranda* does not prohibit the admission of statements made under these circumstances.

Hubbard offered no evidence at the CrR 3.5 hearing. He had read and understood his rights the previous evening and had expressed a desire to speak with his parole officer at that time. There was, therefore, no evidence in the record to suggest that at 10 a.m. the next day Hubbard did not have in mind the constitutional rights given him both orally and in writing. Repeated warnings were not necessary.

Where a defendant has been adequately and effectively warned of his constitutional rights, it is unnecessary to give repeated recitations of such warnings prior to the taking of each separate in–custody statement.

*State v. Duhaime,* 29 Wn. App. 842, 852, 631 P.2d 964 (1981). *See also State v. Blanchey,* 75 Wn.2d 926, 454 P.2d 841 (1969), *cert. denied,* 396 U.S. 1045 (1970). Hubbard's statements were admissible as substantive evidence.

Even if we assume, arguendo, that the statements by Hubbard to his parole officer were obtained in violation of

*Miranda,* there is an additional ground for sustaining the ruling of the trial court in admitting the statements as rebuttal evidence. It is well established that a defendant's voluntary statements, obtained in violation of *Miranda,* may be introduced to impeach the defendant if he or she testifies. *United States v. Havens,* 446 U.S. 620, 64 L. Ed. 2d 559, 100 S. Ct. 1912 (1980); *Harris v. New York,* 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643 (1971). As explained in *Harris v. New York,* at 224–26:

> It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards.
>
> . . .
> . . . The impeachment process here undoubtedly provided valuable aid to the jury in assessing petitioner's credibility, and the benefits of this process should not be lost, in our view, because of the speculative possibility that impermissible police conduct will be encouraged thereby. Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief.
>
> Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. . . .
>
> The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances.

When a defendant's statements, made without *Miranda* warnings, are offered to rebut the testimony of another defense witness, a comparable choice is presented between admitting the evidence and thereby aiding the truthfinding process, or excluding the evidence, on the speculative possibility of some deterrent effect on police conduct. The reasoning supporting admission of the defendant's statements to impeach his own testimony in *Harris* is applied with equal logic when the defendant's statements are admitted for the purpose of rebutting alibi

testimony presented by a witness called by the defendant. If the evidence is excluded, the truthfinding process suffers. If the defendant's pretrial statement admitted for impeachment purposes provides a "valuable aid to the jury", *Harris,* at 225, then it serves the same purpose when admitted as rebuttal evidence. From the standpoint of the use that will be made of the evidence by the trier of fact, there is often very little, if any, difference between evidence admitted for impeachment purposes and evidence admitted as substantive evidence. As Justice Brennan stated in his dissenting opinion in *Harris*:

> "An incriminating statement is as incriminating when used to impeach credibility as it is when used as direct proof of guilt and no constitutional distinction can legitimately be drawn."

*Harris v. New York, supra* at 231, quoting *People v. Kulis,* 18 N.Y.2d 318, 221 N.E.2d 541, 543, 274 N.Y.S.2d 873 (1966) (dissenting opinion).

To permit use of the defendant's statements for rebuttal evidence, particularly under the circumstances of this case, does not undermine the purpose to be served by the exclusionary rule. As acknowledged in *Harris,* at page 225, the purpose of that rule is served "when the evidence in question is made unavailable to the prosecution in its case in chief."

Hubbard also contends the trial judge erred in giving instruction 9, which reads:

> You may give such weight and credibility to any alleged confession or admission of the defendant as you see fit, taking into consideration the surrounding circumstances.

Hubbard contends the instruction directed the jury to consider his statements to the parole officer for any purpose, and not simply for the purpose of impeachment. As we discussed above, such use was proper.

After the parole officer testified as a rebuttal witness for the State, Hubbard denied making the statement. While WPIC 6.41, from which instruction 9 is drawn, is generally

used when an issue is raised as to voluntariness, its use in this case was appropriate. The jury received evidence of an alleged admission by Hubbard which he denied making. The trial judge did not err in giving the instruction. Note on Use, WPIC 6.41, 11 Wash. Prac. 89 (1977).

Hubbard called Mr. S., an eyewitness to the shooting, as a defense witness. Mr. S. testified he saw the shooting and the man who did it. He said he did not get a good look at him, but did observe that he was wearing a beard. In a police–conducted lineup, Mr. S. had identified a person other than Hubbard as the killer.

During the State's cross examination of Mr. S., he was shown exhibit 15, a photograph of Hubbard taken 4 months before the shooting. In the photo, Hubbard wore a beard. During trial, he was clean shaven. Mr. S. testified the person shown in the photograph looked like the man who did the shooting. Hubbard now contends the trial judge erred in admitting exhibit 15. We find no error.

The photograph had probative value because Mr. S. said the bearded man in the photo looked like the man who did the shooting and also resembled Hubbard. Hubbard argues on appeal that to show the witness a single photograph of Hubbard and have the witness link the person shown in the photograph to the killing is impermissibly suggestive. This objection was not made at trial and, accordingly, was waived. *State v. Kroll,* 87 Wn.2d 829, 843, 558 P.2d 173 (1976). At trial, the only objection to exhibit 15 was lack of proper foundation, with no particularity as to the nature of the deficiency. Mr. S. had previously testified the photo appeared to be of Hubbard. The trial judge did not err in admitting exhibit 15.

Over defense objection, one of the investigating police officers was permitted to testify that immediately after the shooting, Bousley told him that "Ray" Hubbard shot Edwards. Hubbard now contends the trial judge erred in admitting, as an excited utterance, the police officer's testimony relating to an eyewitness' identification of Hubbard as the killer. We do not agree.

■ An "excited utterance" is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." ER 803(a)(2). A statement may constitute an excited utterance even though made in response to a question asked by an investigating officer. *Johnston v. Ohls,* 76 Wn.2d 398, 457 P.2d 194 (1969). The trial judge could reasonably conclude Bousley's statement met the requirements of an excited utterance and was therefore admissible. *See* ER 104.

Hubbard further contends the trial judge committed reversible error in admitting evidence that Hubbard committed a burglary of the victim's home some 6 months prior to the killing. We do not agree.

■ Evidence of other crimes or wrongs is admissible to establish, *inter alia,* motive and identity, provided that its probative value outweighs its potential for prejudice. ER 404(b); *State v. Robtoy,* 98 Wn.2d 30, 653 P.2d 284 (1982). Erroneous admission of evidence of other crimes or wrongs is not error of constitutional magnitude, however. Rather, the error is prejudicial only if, within reasonable probabilities, the error materially affected the outcome of the trial. *State v. Robtoy, supra.*

Evidence that the victim had Hubbard beaten is obviously relevant to establish Hubbard's motive for killing the victim. The fact that Hubbard was beaten because he may have previously burglarized the victim's home has no relevance other than to show a motive for the beating of Hubbard and is therefore a link in the chain of evidence showing Hubbard's motive for killing the victim. There was no abuse of discretion in admitting this evidence. Furthermore, in light of all the evidence presented in this case, admission of testimony that Hubbard may have burglarized the victim's home 6 months before the shooting creates no reasonable probability that the outcome of the trial was materially affected.

At trial, two witnesses were permitted to relate statements by the victim following a telephone conversation in

which the victim's wife allegedly reported her suspicions that Hubbard had burglarized their home. Hubbard contends this testimony constituted "double hearsay" and was therefore improperly admitted. The State argued to the trial judge that the evidence was not offered to prove the truth of the matter asserted but to show the victim's state of mind, *i.e.*, his belief Hubbard had burglarized his home. *See* ER 803(a)(3).

We agree that the statements fall within the parameters of ER 803(a)(3). While the probative value is weak, we cannot say the trial judge abused his discretion in admitting the evidence.

Hubbard further contends the trial judge erred in failing to grant a continuance or to exclude the testimony of two State witnesses disclosed 4 days prior to trial. We do not agree.

■ Granting or denying a motion for a continuance rests within the sound discretion of the trial judge, and his ruling will not be disturbed on appeal unless the trial judge either failed to exercise his discretion or manifestly abused his discretion. *State v. Miles,* 77 Wn.2d 593, 464 P.2d 723 (1970). Denial of a motion for a continuance constitutes reversible error only where actual prejudice to the defendant results. *State v. Oughton,* 26 Wn. App. 74, 612 P.2d 812 (1980).

The record shows the State disclosed the witnesses to the defense promptly after they became known to the State, thus complying with CrR 4.7(h). The witnesses were available to defense investigators 4 days before trial, and there is no allegation and no showing that the failure to grant a continuance prejudiced Hubbard. The trial judge did not err.

Hubbard lastly contends the trial judge erred in ruling that the probative value of his prior conviction for violation of the Uniform Controlled Substances Act exceeded its prejudicial effect, and was therefore admissible for impeachment purposes under ER 609(a) and *State v. Alexis,* 95 Wn.2d 15, 621 P.2d 1269 (1980).

Hubbard testified and the State chose not to impeach him with the prior conviction. As Hubbard suffered no prejudice from the ruling, *cf. State v. Hill,* 83 Wn.2d 558, 520 P.2d 618 (1974) (erroneous ruling admitting a prior conviction may deny a defendant his constitutional right to testify in his own behalf), we do not reach the question of whether the trial judge's determination was in error.

The judgment and sentence are affirmed.

WILLIAMS, J., concurs.

RINGOLD, J. (dissenting)—I disagree with the majority's opinion because it: (1) permits the use of the defendant's statements as substantive evidence to rebut the testimony of a person other than the defendant; and (2) approves the submission of instruction 9 to the jury.

Hubbard moved below to suppress custodial statements he made to police and to his parole officer. A hearing was held pursuant to CrR 3.5. The hearing judge, after considering the testimony of several witnesses and the argument of counsel, made findings of fact and conclusions of law. The judge made two rulings. He determined that Hubbard's statements to the police were made freely and voluntarily after being advised of his *Miranda*[1] rights and were admissible in the State's case in chief. He also determined that Hubbard's earlier statements to his parole officer were made without being informed of his *Miranda* rights, and were not admissible in the State's case in chief, but were admissible in rebuttal. The majority misuses the appellate function in deciding sua sponte without cross appeal, assignment of error, argument or briefing, that the second ruling was in error.

This ruling was argued to the judge prior to his determination but this court has not been favored with those arguments. The trial proceeded on the premise that the statements were not admissible in the State's case in chief.

---

[1] *Miranda v. Arizona,* 384 U.S. 436, 1 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966).

Had the ruling been otherwise, the entire posture of the trial would have changed. I am well aware that where constitutional rights are at issue, a reviewing court must independently evaluate the evidence. *See State v. Daugherty,* 94 Wn.2d 263, 269, 616 P.2d 649, *cert. denied,* 450 U.S. 958 (1980). This rule, however, does not apply when the State appeals from an order suppressing evidence, *State v. Tocki,* 32 Wn. App. 457, 461, 648 P.2d 99 (1982), and certainly does not require reevaluation of the evidence supporting a ruling adverse to the State to which no claim of error is addressed. The court's ruling suppressing the evidence became the law of the case, not subject to review by this court any more than are allegedly erroneous instructions to which no error is assigned. *See State v. Byrd,* 25 Wn. App. 282, 287, 607 P.2d 321 (1980). The majority is indulging in "Monday morning refereeing"; changing the rules by which the game was played to achieve a desired result. This is the precise unfairness which the law of the case doctrine seeks to avoid.

Nevertheless, the majority concludes the court erroneously suppressed Hubbard's statements to his parole officer. I believe the court's ruling was correct. The night he was arrested, Hubbard was advised of his *Miranda* rights. He stated he did not want to waive his rights or make a statement but wanted to talk to his parole officer. Hubbard remained in custody. The next day, Hubbard's parole officer came to speak with him. She did not advise Hubbard of his *Miranda* rights or obtain a waiver before questioning him. She testified that it was her policy not to advise her clients of such matters unless they asked.

The majority does not dispute these facts, but concludes that "Hubbard's statements to his parole officer were not the result of interrogation by law enforcement officers . . .". *Miranda* warnings must be given before any custodial interrogation by law enforcement officers. It is undisputed that Hubbard was in custody and was questioned regarding the events which led to his arrest. Apparently, therefore, the majority decides that *Miranda* warnings need

not be given when custodial interrogation is conducted by parole officers.

No case in the state of Washington, until now, has sanctioned the use of custodial statements made by a parolee while he is in custody and is being interrogated by his parole officer without first being advised of his *Miranda* rights.[2] It distorts the purpose of the Fifth Amendment, as set out in *Miranda,* to suggest that the warnings are unnecessary in such a situation:

> Today, then, there can be no doubt that the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves. We have concluded that without proper safeguards *the process of in–custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.* In order to combat these pressures and to permit a full opportunity to exercise the privilege against self–incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.

(Italics mine.) *Miranda,* 384 U.S. at 467. *Miranda* applies to any official custodial interrogation, whether the interrogation is conducted by Internal Revenue agents, *Mathis v. United States,* 391 U.S. 1, 20 L. Ed. 2d 381, 88 S. Ct. 1503 (1968), court appointed psychiatrists, *Estelle v. Smith,* 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866 (1981), prison guards, *State v. LaRue,* 19 Wn. App. 841, 845, 578 P.2d 66 (1978), or prosecuting attorneys, *see United States v. Duvall,* 537 F.2d 15, 24–25 (2d Cir. 1976), *cert. denied,* 426 U.S. 950, 49 L. Ed. 2d 1188, 96 S. Ct. 3173 (1976). The jurisdictions which have considered the question presented

---

[2]*State v. Johnson,* 9 Wn. App. 766, 514 P.2d 1073 (1973) addresses the issue of whether custodial statements obtained by a probation officer without advising the probationer of his constitutional rights are admissible in a revocation hearing. The court declined to express an opinion as to the admissibility of such statements in a subsequent criminal *prosecution. Johnson,* at 773.

here almost uniformly hold that a parole officer is an agent of the State bound by the requirements of *Miranda. See Marrs v. Maryland,* 53 Md. App. 230, 452 A.2d 992, 994 (1982) and cases cited therein.[3]

RCW 9.95.220 grants extensive arrest powers to probation and parole officers and reflects the intention of the Legislature that they be considered law enforcement officers:

> Whenever the state parole officer or other officer under whose supervision the probationer has been placed shall have reason to believe such probationer is violating the terms of his probation, or engaging in criminal practices, or is abandoned to improper associates, or living a vicious life, he shall cause the probationer to be brought before the court wherein the probation was granted. For this purpose any peace officer or state parole officer may rearrest any such person without warrant or other process.

When we consider the role of parole officers under the sentencing scheme in the State of Washington and the powers granted to them by the Legislature, it is manifest that they are "law enforcement officers," as that term is used in *Miranda. See also State v. Roberts,* 14 Wn. App. 727, 732, 544 P.2d 754 (1976); *State v. Hall,* 35 Wn. App. 302, 305–06, 666 P.2d 930 (1983).

The majority also suggests that *Miranda* warnings were not required because the parole officer's purpose in conducting the interview was to "get [Hubbard's] version of the incident." This is presumably the purpose of all law enforcement interrogation of a suspect. However, the parole

---

[3]The United States Supreme Court recently decided that *Miranda* warnings need not be given during routine meetings between a probationer and a probation officer because the probationer is not "in custody." *Minnesota v. Murphy,* ___ U.S. ___, 79 L. Ed. 2d 409, 104 S. Ct. 1136 (1984). The Court stated "We emphasize that Murphy was not under arrest and that he was free to leave at the end of the meeting. A different question would be presented if he had been interviewed by his probation officer while being held in police custody . . ." *Minnesota v. Murphy,* 104 S. Ct. at 1143 n.5. I infer from this statement that *Miranda* warnings are required prior to *custodial* interrogation by a probation or parole officer, which is the situation presented here.

officer's purpose in questioning Hubbard is immaterial to the question of whether she was legally required to advise him of his constitutional rights. *See Minnesota v. Murphy,* ___ U.S. ___, 79 L. Ed. 2d 409, 104 S. Ct. 1136, 1144–46.

> [S]o long as the police conduct is likely to elicit incriminating statements and thus endanger the privilege, it is police "interrogation" *regardless of its primary purpose or motivation* . . . if it otherwise qualifies as "interrogation," *it does not become something else* because the interrogator's main purpose is [something other] than the procuring of incriminating statements, even though self–incrimination may be foreseen as a windfall.

*Whitfield v. State,* 287 Md. 124, 143, 411 A.2d 415, 426 (1980), quoting Kamisar, *Brewer v. Williams, Massiah, and Miranda: What is "Interrogation"? When does it Matter?,* 67 Geo. L.J. 1, 9 (1978). Asking Hubbard where he was on the night of the incident and what he saw was, assuming Hubbard's guilt, likely to elicit an incriminating response. This is interrogation within the meaning of *Miranda.*

The majority relies on *State v. Duhaime,* 29 Wn. App. 842, 631 P.2d 964 (1981) for the proposition that *Miranda* warnings were unnecessary. In *Duhaime* the defendant was advised of his rights by police and signed a written waiver form. Thirty minutes later he was again informed of his rights, and gave a detailed taped confession to the murder. *Duhaime,* at 845. Two hours later he was interviewed by a social worker to determine whether Duhaime was a danger to himself. She told him her report would not be confidential and that everything he said could be used against him. She did not give Duhaime the *Miranda* warnings. The court held that because the defendant effectively waived his right to remain silent less than 2 hours before his interrogation by the social worker, restatement of the *Miranda* warnings was not required. The facts of this case are markedly different. The State cannot rely on the advice of rights by the police the night of Hubbard's arrest, because Hubbard declined to waive them.

Once Hubbard exercised his right to remain silent, cus-

todial interrogation by any law enforcement officer, including his parole officer, required new *Miranda* warnings and a waiver. *See Michigan v. Mosley,* 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321 (1975). The fact that Hubbard's statements were not coerced does not render them admissible. *See Edwards v. Arizona,* 451 U.S. 477, 483–84, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981). The State must first prove that he knowingly and intelligently waived his right to remain silent. *Tague v. Louisiana,* 444 U.S. 469, 470, 62 L. Ed. 2d 622, 100 S. Ct. 652 (1980). The State did not meet this burden. The trial court, therefore, properly ruled that the statements were inadmissible in the State's case in chief.

To preclude any misapprehension that may result from the majority's observation that the lower court ruled Hubbard's statements admissible as rebuttal, I must refer to the court's oral opinion. The hearing judge stated:

> The motion to suppress those statements is granted. However, I feel they are admissible under, I think, . . . *Harris,* in terms of any rebuttal, that I think they clearly could come in at least as part of the case of the State in rebuttal. However, not as part of their case in chief.

The pretrial judge's ruling thus allowed the admission of the defendant's statements only as permitted by *Harris v. New York,* 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643 (1971). The majority's opinion misconstrues both the evidentiary and the constitutional bases for the limited rule enunciated in that case.

I am not aware of any appellate court which holds that *Harris* permits impeachment of a person other than the defendant through the use of a defendant's incriminating statements which were obtained in violation of *Miranda.* An analysis of the *Harris* opinion reveals that such a conclusion is erroneous. In evidentiary terms, *Harris* allows impeachment by prior inconsistent statements, in which the credibility of a witness is attacked by evidence of a prior statement inconsistent with that witness' testimony. *See* ER 613. To be distinguished is the method of impeachment sometimes called "mere contradiction," in which the sub-

stance of a witness' in–court testimony is contradicted by the testimony of a second witness, as occurred here. 5 K. Tegland, Wash. Prac., *Evidence* § 254 (2d ed. 1982). Impeachment by contradiction is actually *rebuttal* evidence. The contradictory evidence is not limited to impeaching the witness' credibility, but is competent to prove the substantive facts encompassed therein.

> Unlike impeachment by prior inconsistent statement, impeachment by mere contradiction is not within any exception to the hearsay rule. . . . To be admissible, such extrinsic evidence must be independently competent and must be admissible for a purpose other than that of attacking the credibility of the witness.

(Citations omitted.) *Jacqueline's Wash., Inc. v. Mercantile Stores Co.*, 80 Wn.2d 784, 788–89, 498 P.2d 870 (1972). The parole officer's testimony was produced in rebuttal to contradict the testimony of the alibi witness, not that of the defendant/declarant, and thus was admitted to prove the substantive facts encompassed in such evidence. Nor does it comport with reality to believe that Hubbard's incriminating statements, otherwise inadmissible though purportedly being introduced solely to affect the alibi witness' credibility, would be disregarded as substantive evidence by the jury.

The constitutional question addressed in *Harris* was whether the Fifth Amendment, as explicated in *Miranda,* requires suppression of all illegally obtained statements regardless of the purpose for which the statements are offered. Chief Justice Burger, writing for the majority, recognized that "[s]ome comments in the *Miranda* opinion can indeed be read as indicating a bar to use of an uncounseled statement for any purpose, but discussion of that issue was not at all necessary to the Court's holding and cannot be regarded as controlling." *Harris,* 401 U.S. at 224. Justice Brennan, writing for the dissent, disagreed with Burger by arguing that *Miranda* indeed settled this issue and

> [t]his language completely disposes of any distinction between statements used on direct as opposed to cross–

examination. 'An incriminating statement is as incriminating when used to impeach credibility as it is when used as direct proof of guilt and no constitutional distinction can legitimately be drawn.'

(Footnote omitted.) *Harris,* 401 U.S. at 231, quoting *People v. Kulis,* 18 N.Y.2d 318, 324, 221 N.E.2d 541, 543, 274 N.Y.S.2d 873 (1966) (dissenting opinion). Thus, the majority's intention in *Harris* was to open the door but a crack to permit the utilization of the inadmissible statements in the narrow context of impeaching the credibility of a testifying defendant. This was over the vigorous objection of the dissenters. Today, the majority here seeks to remove the door entirely.

An issue similar to the one presented in the case at bench was considered in *United States v. Hinckley,* 672 F.2d 115 (D.C. Cir. 1982), where the government sought to introduce the defendant's statements, obtained in violation of *Miranda,* in order to rebut testimony by expert psychiatric witnesses. The court rejected a "testimony–by–proxy" theory advanced by the government and adopted by the majority here, restricting the *Harris* rule to impeachment of the defendant only.

> Although it is indeed true that if a defendant takes the stand and testifies in a manner contradicted by illegally obtained evidence, that evidence can be used for the limited purpose of impeachment, there is as yet no basis in law for converting this limited exception into a general license to use illegally obtained evidence for rebuttal purposes. And if there were, the government does not adequately explain why it would single out the insanity defense for application of the testimony–by–proxy theory. All defense testimony is in a sense testimony by proxy, *yet the government concedes that it would not seek to apply its rebuttal theory to an alibi or other affirmative defenses. We can find no reason for such a distinction.*[4]

---

[4]Here, of course, the State seeks to employ illegally obtained statements to rebut alibi testimony, which the prosecution in *Hinckley* conceded it would not attempt to do.

(Footnotes omitted. Italics mine.) *Hinckley,* at 134. The *Hinckley* court correctly notes that there is no apparent reason for limiting rebuttal of defense witnesses with illegally obtained evidence to a particular type of defense witness. If the majority's rationale prevails that rebuttal use of the inadmissible statements is proper, it follows that such evidence may be used to "impeach" any defense witness. Any testimony presented by the defense which is inconsistent with inadmissible statements of the defendant would permit the admission into evidence of the defendant's incriminating statements. We would thus establish a broad rule of admission for otherwise inadmissible statements, eviscerate the *Miranda* rule, and enhance the possibilities for circumventing constitutional protections.

### INSTRUCTION 9

The majority opinion gives the impression that the note on the use of WPIC 6.41 permits its use here. The note and comment to WPIC 6.41, 11 Wash. Prac. 89 (1977) in pertinent part provide:

### NOTE ON USE

This instruction must be given upon request of a defendant when, after a CrR 3.5 hearing, the trial court has ruled an admission or confession admissible and the defendant during trial raises the issue of voluntariness in his evidence or cross–examination of witnesses, CrR 3.5(d).

### COMMENT

See CrR 3.5(d)(4). This instruction is based upon an instruction approved in State v. Huston, 71 Wn.2d 226, 236, 428 P.2d 547 (1967). An instruction as to weight and credibility of a confession is a procedural rather than an absolute constitutional right; . . .

In my view the instruction may be used only at the request of the defendant when he challenges the voluntariness of a confession ruled admissible as substantive evidence.

Instruction 9 should not have been given. Hubbard did not argue that the alleged statement was involuntary. *See* WPIC 6.41, *supra;* CrR 3.5(d)(4). The instruction is irrelevant to the alibi witness' credibility as it addresses only the

weight and credibility of the defendant's statements. It does not inform the jury of the limited purpose for which the evidence is purportedly admitted. The instruction is not neutral, but emphasizes the importance of the defendant's incriminating statements. Instruction 9 magnifies the error perpetrated by the trial court in permitting the statements to be introduced as evidence.

For the reasons stated, I would reverse the judgment and sentence and remand for new trial.

Review granted by Supreme Court June 8, 1984.