IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 82640-9-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| TONY COMBS, | ) | |
| | ) | |
| Appellant. | ) | |

CHUNG, J. — Tony Combs appeals his convictions for fourth degree assault and felony harassment, both with domestic violence designations, as well as for failure to register as a sex offender. Combs also claims ineffective assistance of counsel; however, even though the State acknowledges that defense counsel was deficient for failing to properly object to the admission of the recorded custodial interrogation, Combs cannot demonstrate the necessary prejudice. As to Combs's other claims, the State concedes the insufficiency of the charging document for the failure to register as a sex offender charge and the improper imposition of discretionary community custody supervision fees in the judgment and sentence, given his indigency. We affirm the fourth degree assault and felony harassment convictions, reverse the failure to register conviction, and remand to vacate the charge and amend the judgment and sentence as necessary, including removal of the community custody supervision fees.

FACTS

Combs, using the name Antonio Sparks, was living with his girlfriend, Jami Simpson and her daughter. When Simpson noticed a change in his behavior, she decided to investigate his belongings. Simpson discovered his Department of Corrections identification and learned that his name was Combs, rather than Sparks. She searched on the Internet and found information about Combs's past criminal activities. The morning of August 19, 2020, she decided to confront Combs. When Simpson confronted Combs, he "smacked" her. Then, he grabbed her by the shirt collar and threatened to kill her and her daughter if she ever mentioned her discoveries again. Simpson was terrified and began crying.

That same morning, 911 dispatchers in Bellingham received a hang-up call. Immediately after, 911 received another call from the same number. This time the operator heard crying before the call ended. The 911 operator requested a welfare check for the location associated with the call, and police responded to an apartment.

On arrival, the police knocked on the apartment door, but nobody answered. When looking through the glass door, one of the officers saw a man crouched down inside the door. The officer moved away and continued to announce his presence and tell those inside to come outside.

Eventually, Jami Simpson exited the apartment holding a small child. She appeared reluctant and very fearful. Her skin was flushed, and she had a red mark on her face. She had obviously been crying. Simpson told the police, "He is going to kill me. He is going to kill me." She provided the police with the name Tony Combs and said that he had also hit her and scratched her. The police on scene received

information from dispatch that Combs had an outstanding felony warrant for escape from community custody.

Police escorted Simpson away from the building and attempted to convince Combs to come out of the apartment. While Simpson spoke with police, she received text messages from Combs in the apartment. He told Simpson not to let the police into the apartment and to say that everything was fine. Simpson texted back to Combs at the direction of the police.

Combs eventually exited the apartment and was taken into custody. A detective read Combs his Miranda[1] warnings while in the vehicle in transit to the police station. After arriving at the station, the detective conducted a recorded custodial interrogation.

The State subsequently charged Combs with felony harassment domestic violence, assault in the fourth degree domestic violence, unlawful possession of a controlled substance, failure to register as a sex offender, and intimidating a witness, domestic violence. Combs elected to waive his right to a jury trial. After a bench trial, the court found Combs guilty of felony harassment, fourth degree assault, and failure to register as a sex offender, but acquitted him of intimidating a witness.[2] The court sentenced Combs to a standard range sentence based on an offender score over 9.

Combs appeals.

ANALYSIS

I. Ineffective Assistance of Counsel

Over Combs's objection, the trial court admitted the recording of his custodial

---

[1] Miranda v. Arizona, 384 U.S. 436, 461, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).
[2] The trial court previously dismissed the count of unlawful possession of a controlled substance based on State v. Blake, 197 Wn.2d 170, 481 P.3d 521 (2021).

interrogation. Combs alleges he received ineffective assistance of counsel because his attorney failed to cite controlling authority that would have led to the exclusion of his recorded interrogation.

To succeed on a claim of ineffective assistance of counsel, the defendant must demonstrate that defense counsel's representation fell below an objective standard of reasonableness and that the deficient representation resulted in prejudice. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Prejudice requires that "there is a reasonable probability that except for counsel's unprofessional errors, the result of the proceeding would have been different." Id. When a defendant claims ineffective assistance of counsel based on their attorney's failure to object, " 'the defendant must show that the objection would likely have succeeded.' " State v. Vazquez, 198 Wn.2d 239, 248, 494 P.3d 424 (2021) (citing State v. Crow, 8 Wn. App. 2d 480, 438 P.3d 541 (2019)). "[I]f defense counsel fails to object to inadmissible evidence, then they have performed deficiently, and reversal is required if the defendant can show the result would likely have been different without the inadmissible evidence." Id. at 248-49.

Here, counsel erred by failing to object to admission of the interrogation video under the Washington privacy act (WPA), chapter 9.73 RCW. For recordings of custodial interrogations, the WPA requires that "[a]t the commencement of the recording the arrested person shall be fully informed of his or her constitutional rights, and such statements informing him or her shall be included in the recording." RCW 9.73.090(1)(b)(iii). Recordings must strictly comply with the statute. RCW 9.73.090(1)(b); State v. Courtney, 137 Wn. App. 376, 382, 153 P.3d 238 (2007). A

recording that fails to comply is inadmissible. State v. Mazzante, 86 Wn. App. 425, 427, 936 P.2d 1206 (1997).

The record shows, and the parties agree, that Combs's interrogation video does not comply with RCW 9.73.090(1)(b)(iii). A detective advised Combs of his rights in the car on the way to the police station shortly before interrogation. At the beginning of the video, the detective merely confirmed that Combs had been notified of his rights. Combs was not advised of his rights at any point during the recording of his custodial interrogation.

Defense counsel did object to admission of the video interrogation, but on the grounds that Combs should have been re-advised of his constitutional rights due to the break in time between the initial advisement and interrogation. However, in response to the court's request, counsel said he had no authority to support this argument. Thus, the trial court overruled the objection.[3] Without additional objections, the trial court admitted the interrogation video.

The State concedes the video did not comply with the WPA and that had defense counsel raised the WPA violation, the evidence would have been excluded. See Courtney, 137 Wn. App. at 385 (had trial counsel raised objection based on WPA violation to admission of videotaped confession, it likely would have been excluded). Defense counsel's failure to raise the WPA objection to inadmissible evidence was deficient, and reversal is required if Combs can demonstrate that the

---

[3] The trial court based its ruling on State v. Burkins, 94 Wn. App. 677, 696, 973 P.2d 15 (1999). Burkins states, "'Where a defendant has been adequately and effectively warned of his constitutional rights, it is unnecessary to give repeated recitations of such warnings prior to the taking of each separate in-custody statement.'" Id. (quoting State v. Hubbard, 37 Wn. App. 137, 142, 679 P.2d 391 (1984)); see also State v. Fedorov, 181 Wn. App. 187, 192-93, 324 P.3d 784 (2014) ("The mere lapse of time and change of interrogator does not render Miranda warnings 'stale,' necessitating repetition of rights before a voluntary statement may be made.").

outcome of his trial would likely have been different without the recorded interrogation. See Vazquez, 198 Wn.2d at 248-49.

Combs argues he was prejudiced by the video because it included multiple inconsistencies that suggested his guilty conscience and undercut his credibility. He argues that the State relied heavily on the interrogation in closing arguments, emphasizing the inconsistent statements and encouraging the court to look at Combs's demeanor and responses during the interview. He states the inconsistencies were problematic because "the case against Combs boiled down to the testimony and credibility of a single witness: Jami Simpson. It was essentially a 'he said, she said' case."

Combs correctly assesses the importance of Simpson's credibility. During trial, defense counsel highlighted inconsistencies in Simpson's testimony. When handing down the verdicts, the court acknowledged that, "During closing argument Defense did—Counsel did a good a thorough job of pointing out the many discrepancies between what Ms. Simpson was saying on the day of the event, specifically as recorded on three different law enforcement body cam[era]s, and what she testified about at trial." Despite these inconsistencies, the court declined to ignore Simpson's testimony and, instead, credited her testimony as "as truthful as she could recollect."

The trial court made specific findings of fact as to Simpson's credibility. The court noted that "[t]here were some discrepancies between Jami Simpson's statements to law enforcement on August 19, 2020 and her testimony at trial as to some details of her experiences with the Defendant." However, Simpson's "composure, vocal tenor, and eye contact during questioning . . . were indicative that

her testimony at trial was honest to the best of her recollection." The court also relied on police "bodycam," or body camera footage, to reach this conclusion. "The emotional distress that is apparent in these bodycam video coincides with her testimony at trial where she described having been emotionally overwrought on August 19th." Based on the evidence, the court concluded that "[t]he extreme emotional distress Ms. Simpson was under when initially contacted by law enforcement may reflect why her trial testimony was at times inconsistent with statements she made on August 19th."

The findings of fact and conclusions of law focus on Simpson's experience of the events as supported by the police bodycam video and 911 call. For example, the court found the following:

8. Immediately after Ms. Simpson confronted the Defendant about her discoveries the Defendant struck slapped Ms. Simpson in the face. The Defendant followed that slap by grabbing Ms. Simpson around the collar area. The Defendant struck Ms. Simpson while they were in the apartment they shared . . . which is in Whatcom County.

9. Images of Ms. Simpson's face shortly after the incident show reddening on her face and scratch-like marks around her collar bone; marks consistent with the attack defendant perpetrated against Ms. Simpson.

10. On August 19, 2020, Ms. Simpson called 911 sometime shortly after being struck and grabbed by the Defendant. She did not speak any words into the phone but kept the line open. The line would be disconnected and Ms. Simpson called 911 a second time in the same manner. Ms. Simpson called 911 in this manner hoping she could get law enforcement assistance without alerting the Defendant that she had done so. She was afraid of what he might do if he found out she called the police.

11. Ms. Simpson can be heard crying on the 911 recording.

In contrast, the trial court made no findings about Combs's credibility. During closing, the State pointed out Combs's inconsistent statements and suggested the court consider them. "I encourage the court to look closely at Mr. Combs's

7

responses, his demeanor and answers to questions throughout the course of that interview." However, the court did not mention the interrogation video or even make any reference to Combs's version of the events as recounted on the video. Instead, the court relied on Simpson's testimony and other supporting evidence to reach its guilty verdicts. As evidence corroborating Simpson's description of the assault, the court noted the images of her face from shortly after the incident showed reddening and scratch marks. In assessing Simpson's belief of Combs's threats as needed to prove felony harassment, the court stated, "The degree of fear displayed by Ms. Simpson in the body worn camera footage . . . is consistent with a woman who believed the threat to kill her would be carried out." Therefore, the findings and conclusions show that Simpson's credibility and other evidence, rather than Combs's lack of credibility, led to the court's verdict.

Combs fails to demonstrate that the outcome of the trial would have been different had defense counsel successfully excluded the interrogation video. While counsel's performance was deficient, Combs does not demonstrate the prejudice necessary to support his claim of ineffective assistance of counsel.

## II. Insufficient Charging Document

Combs also challenges the sufficiency of the information charging him with failure to register as a sex offender. The State concedes error.

"All essential elements of a crime, statutory or otherwise, must be included in a charging document in order to afford notice to an accused of the nature and cause of the accusation against him." State v. Kjorsvik, 117 Wn.2d 93, 97, 812 P.2d 86 (1991). When a defendant challenges the sufficiency of a charging document for the first time

8

on appeal, we construe it liberally and consider whether (1) the necessary elements appear in any form and (2) the defendant shows actual prejudice from the inartful language. State v. McCarty, 140 Wn.2d 420, 425, 998 P.2d 296 (2000). If the necessary elements are not found or fairly implied, we presume prejudice and reverse without considering actual prejudice. Id. at 425-26. "[T]he result is a dismissal without prejudice to the right of the municipality or state to recharge and retry if it so chooses." City of Auburn v. Brooke, 119 Wn.2d 623, 639, 836 P.2d 212 (1992).

Combs was charged with failure to register as sex offender.[4] An essential element of failure to register is that it was committed "knowingly." RCW 9A.44.132(1); State v. Snider, ___ Wn.2d ___, 508 P.3d 1014, 1019-20 (2022); State v. Peterson, 145 Wn. App. 672, 675, 186 P.3d 1179 (2008). Here, the State acknowledges that the information lacked an allegation that Combs knowingly failed to register.[5] Therefore, we accept the State's concession and reverse and remand to vacate the failure to register conviction.

III. Community Custody Supervision Fees

---

[4] A person commits the crime of failure to register as a sex offender if the person has a duty to register under RCW 9A.44.130 for a felony sex offense and knowingly fails to comply with any of the requirements of RCW 9A.44.130. RCW 9A.44.132(1).

[5] The information alleges:

> On or about a day between the 10th day of July 2020, and 19th day of August, 2020 in the County of Whatcom, State of Washington, [Tony Combs] having been convicted on or about the 16th day of September, 2002, of a sex offense or kidnapping offense that would be classified as a felony under the laws of Washington, to-wit: Rape of a Child in the Third Degree in King County Superior Court, under cause number 02-1-04436-7, being required to register pursuant to RCW 9A.44.130, and having registered as residing at a fixed residence, did cease to reside at that residence and did fail to provide written notice to the county sheriff within 3 business days of moving to a new fixed residence in a new county; and furthermore, the Defendant was previously convicted of felony register as a sex offender in this state or pursuant to the laws of another state, contrary to the Revised Code of Washington 9A.44.130(4) and (5)(a) and/or (5)(b) and 9A.44.132(1)(a), which violation is a Class C felony.

Community custody supervision fees are discretionary legal financial obligations (LFOs) that can be waived by the trial court. State v. Bowman, 198 Wn.2d 609, 629, 498 P.3d 478 (2021). It is procedural error to impose a discretionary fee when the court otherwise agreed to waive such fees. Id. Here, the trial court found Combs indigent and waived several discretionary fees. However, the supervision fees were not separately identified as LFOs, but were imposed as part of the obligations set out in the "Community Custody" section of the standard judgment and sentence form. The State concedes the court intended to impose only the mandatory LFOs and the community custody supervision fee should be struck from the judgment and sentence. We agree and remand for this purpose.

We affirm the fourth degree assault and felony harassment convictions, reverse the failure to register conviction, and remand to vacate that conviction and to strike the supervision fees from the judgment and sentence.

_Chung, J._

WE CONCUR:

_Birk, J._         _Hazelrigg, J._